UNITED STATES *v.* SHELDON & Co. (No. 494).[1]

GUM RESIN A CRUDE DRUG NOT ADVANCED IN CONDITION.

The importation is of gum resin or rosin. This is the product of the ordinary treatment that oleoresin or crude turpentine is subjected to in order to separate its two contents. By the application of heat the turpentine is vaporized, passed through a worm, and condensed; the resin content being at the same time run off from the boiler of the still into a vat, but cleansed, in passing through screens, of chips, bark, insects, and dirt, accumulated in taking the turpentine from the tree. These processes have been uniformly held not to advance an article from its crude state; not to advance it either in value or condition as those terms are used and uniformly construed in revenue statutes. They merely serve to get the article by itself. The terms "in a crude state" are broad enough to include as "crude" all the grades of resin shown by the record in this case.—Roessler & Hasslacher Chemical Co. *v.* United States (94 Fed. Rep., 822); United States *v.* Godwin (91 Fed. Rep., 753); Schoenemann *v.* United States (119 Fed. Rep., 584).

United States Court of Customs Appeals, February 1, 1912.

APPEAL from Board of United States General Appraisers, G. A. 7107 (T. D. 30982).

[Affirmed.]

*D. Frank Lloyd,* Assistant Attorney General (*Thos. J. Doherty* on the brief), for the United States.

*Curie, Smith & Maxwell* (*W. Wickham Smith* of counsel) for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This case concerns an importation from southern France and Spain of merchandise returned by the appraiser and assessed by the collector at the port of Chicago as "gum resin" advanced in value or condition, as provided in paragraph 20 of the tariff act of 1909.

---

[1] Reported in T. D. 32245 (22 Treas. Dec., 204).

It is claimed by the importer to be entitled to free entry under paragraph 559 of said act as "gum resin crude, not advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture."

Other claims which we deem irrelevant are made.

The imported article is the well known translucent, compact, brittle, pulverizable rosin of commerce imported in barrels.

It is agreed by both parties to the action, and seems to have been considered in the commerce of the country for many years, that this article is a gum resin. Confirmation of this from 1884, at least, to date will be found in T. D. 6694; G. A. 1528 (T. D. 12977); G. A. 3063 (T. D. 16099); G. A. 3133 (T. D. 16304); G. A. 3892 (T. D. 18090), and the record.

This controversy concerns the single question whether, or not, such resin so imported has been "advanced in value or condition by any process or treatment whatever from the condition of a crude drug to a condition beyond that essential to the proper packing of the drug and prevention of decay or deterioration pending manufacture."

While the merchandise was produced in southern France and Spain, the testimony in the record is almost wholly devoted to the methods of production of resin or rosin in this country.

The terms "resin" and "rosin" seem to be used, commercially at least, interchangeably.

The method of production abroad is set forth in a certificate duly authenticated and admitted in evidence. It recites:

The raw rosin or "gemme" (gum of trees) is harvested in pots placed near the lower part of incisions made in seaside pines.

This matter, which contains a certain proportion of water and impurities, such as wood shavings, pine needles, and insects, is brought in barrels to the works, which are located near the place of production.

Such works consist of boilers, used for the purpose of melting the "gemme" (gum of trees) in order to remove therefrom all the impurities contained therein, and of stills (alembics) of various systems for extracting by means of distillation the oil of turpentine which the "gemme" (gum of trees or resin) contains. The residuum left from said distillation leaves then the still (alembic), passes through sieves and forms the so-called colophony or rosin ("Brai").

Its color is clear during the first months of the harvest, April, May, and June, and it becomes dark during the end of the campaign in the months of October and November.

The colophony is thereupon placed in barrels of pine wood which contain, in general, 3 to 400 kilograms of matter.

The most detailed, as well as probably the most accurate, description of the process of the production of resin is found in Spons' Encyclopaedia (vol. 3, p. 1680):

Rosin or Colophony and Rosin-oil.—The several kinds of rosin, colophony, or resin proper are the solid residues obtained by the distillation of the turpentine. The crude turpentine or oleo-resin is submitted to aqueous distillation in a copper

vessel, in place of the old-fashioned iron still which produced a red-coloured oil. The still * * * is charged with crude oleo-resin in the early morning; heat is applied * * * until the mass attains a uniform temperature of 100°–158°. * * * The distillation continues, a mixture of water and turpentine-oil passing over into a wooden separating-tub; * * * when the liquid shows 9 parts of water to 1 part of turpentine-oil, the distillation is stopped, the still-cap is removed, *and the hot rosin remaining in a fluid condition in the still is drawn off by a tap near the bottom, and passed through a fine strainer into a vat,* whence it is baled by long-handled wooden buckets *into barrels for sale.*

The grade of rosin depends (1) upon the quality of the crude oleo-resin under treatment, and (2) upon the skill with which the operation is conducted.

In Thorpe's Dictionary of Applied Chemistry. (vol. 3, p. 343), article "Resins; Colophony," it is stated:

*Colophony.*—Colophony is the residue which remains after the volatile oil has been removed by distillation from the oleo-resins, the crude turpentine which exude from the various species of coniferae. It varies somewhat, according as it is derived from the one or the other species, *and with the method employed for its production.* The browner resins are mostly of American origin, * * * while those of a lighter colour come by way of Bordeaux, being the yield of * * * an inhabitant of the districts of Landes and the Gironde. It varies in colour from pale amber to dark red-brown.

These described processes of the production of the resin of commerce differ in no substantial particular from those described by the several witnesses in this record.

There is no controversy that the material which first exudes from the trees and is caught in the receptacles is an oleoresin generally known as "crude turpentine"; that the distillation process employed, to which this oleoresin or crude turpentine is subjected, vaporizes the turpentine in the oleoresin, whereupon it alone passes through the worm of the still, is cooled, condensed, and collected in receptacles. The heat applied by this process is not sufficient to vaporize and therefore distil the rosin content of the oleoresin, but melts it sufficiently only to permit of the escape of the turpentine. By and as a part of the same process the residue of the oleoresin in the still *is let off through strainers* into a vat. The straining is but a minor incidental part of the process of separating the two contents of the oleoresin. Before it cools it is deposited in barrels, where by the action of the air it becomes hardened. The products of this operation are turpentine and the resin or rosin of commerce. The turpentine has been distilled, in that it has been vaporized, passed through the worm of the still, and then condensed. The rosin content has been heated, but not distilled or vaporized, and in being run off from the boiler of the still into a vat is passed through screens which take therefrom the chips, barks, insects, and dirt which accumulate therein in the reclamation of the oleoresin from the trunk of the tree. It is then deposited in the kegs of commerce. In this condition, as thus

deposited in the kegs of commerce, so far as this record shows, it in no sense differs in the slightest particular from its condition as found in the trunk of the tree. Nor does it differ in the slightest degree from its condition during any step of its processing from the tree to the barrels of commerce save that it is separated by heating from the turpentine in one instance, and separated by screening from dirt and chips in the other instance. It has had no process applied thereto, save that of heating to permit the escape of the turpentine, and, if it may be dignified by the term process, the straining into the vat through sieves taking therefrom the chips, barks, insects, and dirt, not therein an element of its natural condition, but deposited therein as an accident of its reclamation from its parent condition. The straining does not advance its crude or natural condition *per se*, but more nearly restores it to its crude or natural condition.

Considering the resin content alone, as in the tree, its crudest condition, the object being to take it from the tree and pack it in barrels, no process or treatment has been applied thereto which has advanced its value or condition as found in the tree, other than essential to the *proper* packing. The first process recovered it from the tree but did not change the rosin content *per se*. The second process reclaimed it from the turpentine and the dirt, leaves, and insects deposited therein by the first process, but did not change the rosin *per se*. The result of all these processes left it in a condition for proper packing and advanced it no further *from its crudest, natural, parent condition* in the tree than essential to its proper packing. In the language of the court in United States *v.* Godwin (91 Fed. Rep., 753), "it had no effect upon the article itself, other than to get it by itself." Each process was essential to pack the drug found in the tree in a condition nearest possible to its parent or crudest condition. So that, considered from the mechanical standpoint, if "crude" in the statute refers to the condition of original repose of the article, this article has not *as imported* been advanced therefrom further than essential to proper packing.

While it appears from the record that the oleoresin or crude turpentine as it exudes from the tree is sometimes the subject of commerce in this country, it does not appear from the record that such is an article of commerce abroad, or ever has been imported. When so bought and sold in this country it is as "crude turpentine" and not as "resin." Likewise, while it is shown from the record that there sometimes appears in the commerce of this country an article styled "unstrained resin," which consists of the resinous residue left in the boiler of the still having there within the chips, barks, insects, and dirt, it does not appear by the record that such is an article of commerce abroad or is or ever has been imported.

The contention of the Government in this case, as stated by the Assistant Attorney General (Record, p. 71), is:

I am going to show that the crude gum resin of the paragraph is this crude turpentine, and inferentially and also by direct testimony I shall show that the resin is an advanced product made from that.

This position, however, counsel for the Government seems to have abandoned at the hearing in this court, and the position taken that the residue in the still which has not completed its ordinary processing to become resin, but which is sometimes bought and sold as "unstrained resin," is the crude resin of commerce, and that the straining constitutes an advance in value or condition.

When and as it comes forth in due and regular course from this mechanism of production it becomes the article known in trade and commerce and in science as "gum resin" or rosin. The fact that in some cases an incomplete production called "unstrained" resin is put upon the markets, necessarily produced by eliminating part of the regular process of producing resin, does not militate against the contention that the true scientific and commercial article is the one produced in the regular process. The fact that the immature article is bought and sold as "unstrained" resin indicates that it is not the true resin which is bought and sold as "resin" only, the purchaser indicating the color or other quality, all of which facts are conclusively shown by the Government's witnesses. "Unstrained" as here used plainly implies unfinished or partly processed resin. It is not the common resin of commerce either as shown by this record or the lexicographic definitions thereof.

As imported and as bought and sold in this country the merchandise is a brittle, solid mass in barrels. Its condition forbids it being subjected *per se* to final or further uses without substantial processes being applied. If used for making oils it must be treated with sulphuric acid and then caustic soda and distilled. As medicinal ointments it must be pulverized and compounded with other medicinal ingredients. If in varnishes, refined and combined with linseed oil. If in soap, by distillation and combination with lime, soda, and other alkalies.

The record shows that a variety of grades of resin are produced. There is a consequent variety of prices dependent upon the grade of the article. Among the well recognized grades of resin are those dependent upon color. Some of the witnesses speak of "unstrained" resin as a grade of the commercial article. Each grade is known and recognized in commerce and produced by a single process, the output of which becomes, for the first time, one of the grades of the resin of commerce. By the slightest change in the process there would be produced a different grade. The increase

of the heat in the same apparatus will result in a light or a dark resin. The young tree of to-day will produce a light grade, whilst the same tree years hence will produce a dark grade. Likewise, the grade may depend upon the country of origin or the geography of any particular country whence it comes. We have authority that the imported resins of southern France and Spain, such as this importation, are much lighter in color than those of this country. Each is equally when and as produced gum resin in a crude state.

It is contended, as stated by the Government counsel, that only the crudest form or grade of resin known to the commerce of this country comes within purview of paragraph 559. This is not in accord with the decisions and is an interpretation we think not authorized by the language of the statute. The statute does not say "drugs * * * in the crudest state," but "drugs * * * in a crude state." There are undoubtedly many grades of almost if not every class of crude drugs. One may be more crude than another, but so long as it is in a crude state, within the definitions, it is equally within the terms of this statute. To hold otherwise would confine the application of the statute, not to all such drugs in a crude state, but to those only in the crudest state of the particular crude drug. Indeed, the use of the article "a" in the paragraph in the place of "the" indicates any one of several "crude" states that may occur.

Examples may be found in United States v. Merck (66 Fed. Rep., 251), wherein the court expressly said of a drug held crude that the imported article "varies much in quality." In G. A. 4191 (T. D. 19528), quoted infra, the examiner at the port of New York testified concerning crude gutta-percha, held to be free, and uniformly passed as free as crude gutta-percha, that what "he had examined at different times varied very considerable in character, some being almost pure gum, while others contained large proportions of woody fiber, debris of the tree, etc.; that such samples varied in color, the outside of some being light brown, others grayish color, and the inside of a lighter shade."

Under the construction contended for only the crudest form of this gutta-percha could be admitted free, and so, without doubt, with reference to every article coming within the provisions of paragraph 559. Such a construction would render the statutes practically nugatory.

It would seem that where the differences between two grades of the same drug resided solely in the presence in the one of impurities which can be removed by processes which "do not change the character of the drug itself," as in Roessler & Hasslacher Chemical Co. v. United States (94 Fed. Rep., 822); and which impurities are "no part of the article itself," as in G. A. 6370 (T. D. 27360); T. D. 19123; and "other than to get the drug by itself," as in United States v.

Godwin (91 Fed. Rep., 753); "though adding slightly to their value" do not amount to "an advance in value or condition" as those words are used in this paragraph, as held in Schoenemann *v.* United States (119 Fed. Rep., 584).

Conceding for the purpose of consideration that the residue in the still in the midst of its processing and before it is passed through the screens in the process of production is the resin of commerce in its crudest form, the authorities are uniform that the mere straining of a product or article to recover therefrom the chips, barks, insects, dirt, etc., or any extraneous matter, does not constitute an advance in the value or condition contemplated by the tariff revenue statutes. This is true, indeed, even where the presence of such foreign substances are not accidents of the process of production, but are incidents of its parent condition.

What constitutes a "crude" article under the tariff laws not advanced in condition or value has long been well established by customs interpretation.

Screening and cleansing are not refining. Heating and drying are not necessarily manufacturing processes, and straining, cleansing, screening, heating, and drying are not held to advance an article from its crude condition to an advanced condition or value.

As early as 1891, the Board of General Appraisers in passing upon elaterium, G. A. 747 (T. D. 11572), which is the sediment of the juice from the squirting cucumber, said:

The only formula we have for preparation of this article is from the British Pharmacopoeia, as follows: "Cut the fruit lengthwise and lightly press out the juice. *Strain it through a hair sieve,* and set aside to deposit. Carefully pour off the supernatant liquor, *pour the sediment on a linen filter,* and dry it on porous tiles, in a warm place."

While elaterium may be a crude drug, the board is of the opinion that it is not a drug such as the beans, barks, * * * gums, etc., enumerated in paragraph 560, all of which are natural products obtained without artificial manipulation.

The case arose under the tariff act of 1890, and was on appeal ultimately decided by the United States Circuit Court of Appeals for the Second Circuit, United States *v.* Merck (66 Fed. Rep. 251), reversing the decision of the board. The exact provision of the statute within which it was sought to bring the article was—

560. Drugs, * * * in a crude state, and not advanced in value or condition by refining or grinding, or by other process of manufacture. * * *

Notwithstanding the fact that native foreign substances had been screened from the imported article it was held by the court to be within the paragraph as not refined and a crude drug. The court said:

It is cut in two, when the juice flows out, which is allowed to stand until the sediment is deposited at the bottom. The juice is poured off, and the sediment is dried as quickly as possible, to avoid fermentation. The British Pharmacopoeia contains

the following formula for the preparation of the drug as imported: [Here is quoted the definition given by the board.]

It is imported in little cakes, *and varies much in quality.* It is not used in this form by the physician. * * * It is not only a drug, but a crude drug, and is the crudest form in which elaterium is known. It is not reasonable to call the simple process of evaporation and of drying, by which it has been brought into the condition of a drug, a process of manufacture which has advanced the article beyond the condition of a crude drug. The juice has become, by evaporation and drying, a crude drug, but nothing more.

In G. A. 3687 (T. D. 17639), the subject of consideration was papaw milk powder. The board·found:

We find from the evidence that the article is a powder, obtained from the papaw melon, or *carica papaya.* To secure this material the melon is sacrificed and the juice which runs is caught in pans. It is then taken from the pans and laid on flat surfaces in the sunlight until the moisture is evaporated. The resulting solid *is then passed through a sieve* for the removal of mechanical impurities. It is then packed in tins and exported.

It was held by the board that this article was free of duty under paragraph 470 of the tariff act of 1894 as—

Drugs, * * * which have not been advanced in value or condition by refining or grinding, *or* by other·process of manufacture. * * * ·

The United States Circuit Court, Southern District of New York, United States v. Godwin (91 Fed. Rep., 753), in passing upon this principle and subject matter, stated:

This article is a powder from the juice of the papaw melon, caught in pans, dried· in the sun, *sifted* to take out foreign substances, packed in tins, and exported. * * * It was such a drug as those named, if not one of them, and was not edible. Drying in the sun was not refining, nor a process of manufacture. Frazee v. Moffitt (20 Blatch., 267, 18 Fed. Rep., 584). *Neither was the sifting out of mechanical impurities. It had no effect upon the article itself, other than to get it by itself.*

The books fairly teem with decisions supporting this principle. Where the drying, or sifting, or screening, or other manipulation of the imported article does not affect the article *per se,* as found in its natural condition, "other than to get it by itself," such does not constitute an advance in value or condition of the article *per se.* It has uniformly been held, for example, that seeds, to make which a commercial commodity, must in every instance have been preceded by the cutting of the parent stalk, the separating of the seed therefrom, and the screening out of chaff and other impurities, thus reclaiming it in its natural condition, do not thus advance from a condition as a *crude* drug, where such are drugs. And that is true and such process must be applied before few if any of the associate drugs covered by paragraph 559 can possibly be packed.

"Barks" are separated and put in that condition by cleaving, as are bulbous roots, fruits, and flowers. *"Dried* fibers" are separated by cleaving in the first instance and the exposure to the heat in the second instance, which is all that has been done to the rosin. *"Dried*

insects" are subjected to heat in order that they may be dried. While it is true that the natural heat may accomplish the result ordinarily, artificial heat is usually applied just as in the case of rosin. Grains are not alone separated from their natural condition by cleaving, but they are *cleaned by screening*, a precisely similar process to that whereby rosin is run through a screen into the vat as it comes from the boiler of the still. The comparison is the more instructive because the paragraph itself directs it when it states, "drugs *such as*," etc. See G. A. 1379 (T. D. 12730); G. A. 1377 (T. D. 12728); G. A. 1376 (T. D. 12727); G. A. 1375 (T. D. 12726); G. A. 2151 (T. D. 14152); G. A. 523 (T. D. 11080); G. A. 1381 (T. D. 12732); G. A. 1380 (T. D. 12731); G. A. 1379 (T. D. 12730); G. A. 5272 (T. D. 24204); G. A. 4171 (T. D. 19454), and decision before and hereinafter cited.

In G. A. 4191 (T. D. 19528) the question was whether the imported article was crude gutta-percha. The board stated:

That it was *crude gutta-percha*, differing from the crude gutta-percha of commerce only in having *a portion of the impurities removed*, and been made more uniform in grade by reboiling, and thus *fitting it for use especially in making golf balls*. * * *

Dr. Wainwright, chemist in the laboratory in this port, who made an analytical examination of the merchandise, testified in substance that it was freer of such impurities as woody fiber, sand, and the like than the samples of so-called gutta-percha with which he had compared it, but that it contained a small amount of such impurities. He also testified that the crude gutta-percha he had examined at different times varied very considerably in character, some being almost pure gum, while others contained large proportions of woody fiber, debris of the tree, etc.; that such samples varied in color, the outside of some being light brown, others grayish color, and the inside of a lighter shade; that the sample of the merchandise in question was darker than any gutta-percha he had seen before, and was more uniform and homogeneous in texture. * * *

The crude gutta-percha of commerce, therefore, has, as a rule, undergone a process of boiling and contains impurities in varying percentages which must be removed by expensive and difficult processes in order that the gutta-percha itself may be profitably utilized.

It does not appear that the merchandise here in question has been subjected to a process other than that of boiling, and it seems that this was done for the purpose of eliminating impurities and rendering the article uniform or homogeneous in texture. Some impurities still remain. Aside from these the only constituent of the merchandise is gutta-percha, which has not undergone any process of manufacture whereby its commercial name or essential character has been changed. It has simply had a greater proportion of the adulterants or impurities removed from it than most so-called crude gutta-percha of commerce."

The article was held to be free as crude gutta-percha.

In G. A. 4585 (T. D. 21714), the subject of decision was spruce gum. The board stated:

The gum is in small, irregular lumps, which, after being scraped from the tree, have been *cleaned by hand* of sticks, bark, moss, and similar extraneous matter.

It was held to be crude and entitled to admission free of duty under paragraph 548 of the tariff act of 1897.

In G. A. 4606 (T. D. 21804), the question was whether the product of the sago palm was free of duty as "crude sago." The board stated the facts as follows:

· It appears from the testimony in the case that the article before us is a product of the sago palm, and is made in the following manner: The outside wood part is partially taken off, and the pith, from which the sago is produced, is allowed to rest and partly decompose. It is then *pressed through a linen cloth* into a trough of flowing water, which carries off the inert matter, sticks, etc. The resulting mass, which is a thick and heavy paste, is placed in a cylinder and subjected to a rotary motion, which gives it a rounded form, then partially baked, again rotated and partially baked, and the process repeated until the article assumes the condition in which it is imported.

Obviously the reclaimed mass is the identical thing from which the sticks, trash, etc., have been separated, and is the same mass which goes into commerce. The board held that it was entitled to free entry as crude sago.

In Littlejohn v. United States (119 Fed. Rep. 483, 484), the United States Circuit Court, Southern District of New York, confirmed that view and held that the pulp of the sago tree was properly dutiable as crude sago. The court, in part, said:

The second claim of the Government is that it is a completed article when imported, and is fit for present use. This fact might be decisive in some cases, but is not a universal or safe test. In this case *the processes of cleansing* are essential to fit it for trade and commerce in this country; they neither refine nor manufacture it, but *only serve to remove the impurities.* Such processes are not sufficient to change its character from a crude product to a manufacture.

In G. A. 6303 (T. D. 27162), the subject of consideration was fir balsam, drawn from the tree and submitted to a process of straining for purification. The board said:

A number of trade witnesses were examined at the hearings, and there was substantial agreement among them that the merchandise is in the crudest form in which it is bought and sold in trade in the United States, and while the assistant appraiser and the official examiner connected with the drug department in the United States appraiser's office at the port of New York expressed the opinion that the merchandise was in the crude form, nevertheless they state that they had seen it imported in less pure condition—*i. e.*, containing pieces of the bark of the tree.

It is in evidence on the part of the protestant that after this balsam was drawn from the tree *it was submitted to a process of straining for the purpose of eliminating therefrom "bits of sticks, bark, chips, and dirt."* Ordinarily such a process of purification *might* be considered as a process of refining, provided the merchandise was *usually imported* without being submitted to such process; but on the record before us we think the opinion is justified that such a process of purification is not to be considered as a refining of the merchandise since it appears that it is regarded by the trade generally as being in the crude condition as thus imported and is bought and sold as such.

The merchandise was found to be a drug in a crude state, not advanced in value or condition, and entitled to free entry.

In G. A. 6370 (T. D. 27360), the subject of consideration was gum copal. The board said:

Paragraph 548 provides, among other things, for "gums" and "gum resin." The Century Dictionary says that copal is "a hard, transparent, amber-like resin, the product of different tropical trees, melting at a high temperature, and used in the manufacture of varnishes." It seems to us quite clear that it comes within purview of paragraph 548 and should be admitted free of duty.

The board then expressly rests its decision and approves of the view taken by the Assistant Secretary of the Treasury in T. D. 19123. That T. D. is instructive, in that it gives the view of the department as well as the Board of General Appraisers upon these processes and this subject. It concerns gum copal, and states:

I have to inform you that the department is of the opinion that the *removal of scurf from such gum is not a process of advancement in value or condition from a crude state* within the meaning of paragraph 548 of the tariff act of July 24, 1897, * * * inasmuch as *the scurf is no part of the article itself,* but simply foreign matter adhering thereto, and consequently that the merchandise in question is entitled to free entry as a gum resin under said paragraph.

In the early case of Frazee *v.* Moffitt, decided in the United States Circuit Court, Northern District of New York (18 Fed. Rep., 584, 587), we find language announcing distinctly this same principle. The question was whether, or not, baled hay was, or was not, raw or a manufactured article. The court said:

Many articles are properly called raw which have undergone some manipulation. Cotton is picked from the bolls, and cleaned by ginning, and baled. Yet it is raw cotton in the bale. Wheat is cut, and the grains are threshed out, and then subjected to a cleaning machine, and then bagged. Yet it is raw wheat in the bag. So with other grains. The cotton and the grains undergo such change and preparation as exposure to light, and natural or artificial heat, and air, and the manipulation they receive, produce, or allow, be it more or less. Yet neither the cotton nor the grains would be said to be manufactured. Salt and sugar are new articles. Cotton and grains are the same articles they were when on the plant with its roots in the earth. So hay is the same article it was when it was stalks of grass with roots in the earth. * * * Dried apples would not be called a manufactured article, though the apple is peeled and cored and sliced, and dried by exposure to the sun and manipulation. The substance of dried apples is still apples. The substance of dried grass or hay is still grass. Change of name and manipulation do not necessarily constitute manufacture. * * *

The word "crude" as used in tariff laws has by construction and a long and consistent line of decisions been given a meaning somewhat variant from its common and accepted meaning, the frequent reenactment of the term in the statute having been tantamount to a confirmation thereof. What constitutes a refining or advance in condition from the crude state of the article has, likewise, been the subject of judicial and legislative construction, and it is not every manipulation, though it may add something to the value or condition of the article, which may be held to bring it within such language of the

statute. Its presence in a tariff act requires that it be construed with a thought to its apposite conditions provided in the act, to wit, manufactured or a condition of substantial advancement by processing.

We find confirmation of this statement. Thus in Roessler & Hasslacher Chemical Co. *v.* United States (94 Fed. Rep., 822, 823) the court said:

As Dr. Baker states, it is crude as a metal, but not crude as a mineral. It is not "crude" in the common or dictionary sense of an article not manufactured, but it is "crude" in the sense of an article not refined. I think it is an article in a "crude" state, in the tariff sense of "crude."

. It appears from an examination of said act that Congress defines articles of this character as crude, not necessarily by inquiring whether they may or may not have been the result of some manufacture, but by reason of the use to which they are to be applied. Thus, in said act of 1894, the manufactured article glycerin is spoken of as crude, not purified; aluminum, as a manufactured article in crude form; and tartar, bladders, sounds, bones, camphor, coal tar, paper stock, and potash, as crude. * * *

Inasmuch as all of said articles or substances have necessarily undergone some preliminary process of manufacture, and are considered crude only by referring to the purpose for which they are to be used, I think that this article may be "crude" under the tariff designation, although it is the result of a manufacture; and I am inclined to think, in opposition to the contention of the United States, inasmuch as this article is ordinarily only the accidental resultant product from the manufacture of zinc, that it is in its nature a crude by-product. *That it is sifted without changing its character*, and that care is taken not to expose it to the air, is not sufficient to make it a manufacture.

In Schoenemann *v.* United States (119 Fed. Rep., 584, 587), the Circuit Court of Appeals, Third Circuit, announced the same principle, reversing the circuit court, board, and the collector. The question was whether certain shells from which marine animals had been taken and the shells themselves cleansed, by being put into a tub with chloride of lime and then washed with clean water, *in order to remove all animal matter, dirt, and offensive smell*, were free, as "shells not sawed, cut, polished or otherwise manufactured, *or advanced in value from the natural state.*" The court stated:

It is, however, contended that the shells have been "advanced in value from the natural state," within the meaning of those words in the paragraph referred to, and that therefore they are excluded from the free list. We do not think, however, that the cleansing of these shells, in the manner disclosed by the evidence and already discussed, *though adding slightly to their value*, effected a change in them "from the natural state." Seashells are the hard, organized substances forming the exterior covering and protection of certain marine animals, and these hard, bony coverings are not changed from their natural state by having these animals and the adventitious and foreign matter clinging to them removed. They are no part of the shell, and the natural state of the shell remains after this removal takes place. It would be as reasonable to say that the natural state of the shell existed only when the marine animal, which it contained and protected, was present, as to say that there was a change from the natural state, wrought by cleansing it from foreign substances which were no part of it.

These authorities are in exact accord with the conclusion of Judge Lacombe in Standard Varnish Work *v.* United States (59 Fed. Rep., 456). In that case there were placed in the retort palm oil, animal

grease, and tallow, which were boiled in the process of obtaining stearin. It was the residuum which did not find its way through the worm of the retort that was the subject of consideration by the court. The court said of this:

It is not in itself a raw material; it is not found in nature; and, although something left over in the manufacture of candles, it is no longer either the tallow, or the animal grease, or the palm oil.

It is exactly true. The residuum there that came from the retort was the component of the various things that went into the retort, "no single raw material coming therefrom." The contrary is the case here; the oleoresin, which consists of resin and turpentine, is put into the retort and the residuum taken therefrom is *the single raw material, rosin.* It does consist of only "one of the things placed in the retort," and does not consist of a combination of things. It is "not chemically a new body, or a new creation." On the contrary it is one of the same elements, one of the same creations, one of the identical things that was placed in the retort before and which is returned therefrom in its natural state.

Further illustration of a similar definition attached to the word "crude" as used in tariff revenue laws is found in McKesson *v.* United States (113 Fed. Rep. 996), wherein the merchandise was the product of a process by which the gangue or slag and rock were removed and only the ore of antimony was imported. 'It was held to be crude within that term under the tariff act of 1897.

This court in repeated decisions has approved that doctrine. See United States *v.* Salomon (1 Ct. Cust. Appls. 246; T. D. 31277). And in United States *v.* Michelin Tire Co. (1 Ct. Cust. Appls., 518; T. D. 31544), this court held that where old scrap or crude rubber was chopped and there was separated therefrom particles of iron, such as rivets, valves, etc., grinding the rubber into smaller particles, chemically treating, washing, riffling, and blowing these, are all done to separate the rubber from the other component materials of the old scrap or refuse from which it was reclaimed; in short, to recover or reclaim the rubber content of these old articles in a shape suitable for transportation or marketing did not carry it out of the category of "crude" rubber in paragraph 579 of the tariff act of 1909.

Wherefore it is concluded:

1. If the "crude state" of the statute refers to the resin as found in the tree, the resin as imported in the barrels is identical therewith except so far as it may necessarily be changed or advanced by its recovery therefrom and its "proper packing" in the barrels.

2. The processing of the crude turpentine to the resin in the vats or barrels is by a single mechanism, one of the results of which is to eliminate the chips, bark, and dirt. If a part of this mechanism is removed or a part of the process eliminated the product is not the

well known resin of commerce or science, but an unfinished product or resin called "unstrained resin."

3. If "unstrained" resin be deemed a finished article, then it becomes one of the several grades of the resin of commerce. While there is nothing in the record to show that article more crude or less valuable than many of the other grades, assuming it to be the crudest grade, it does not exclude the other grades of resin from the terms of the statute, "in a crude state," for that term is broad enough to include as "crude" all the grades of resin shown by this record.

4. Assuming that the resinous residue in the midst of the processing of the crude turpentine at the point where it is separated from the turpentine is the resin of commerce, and that it is thereafter separated from the chips, bark, and dirt by screening, those processes have been uniformly held not to advance an article from its crude condition either in value or condition as those terms are used and uniformly construed in revenue statutes.

The article therefore is entitled to free entry, and the decision of the Board of General Appraisers should be *affirmed*.

### DISSENTING OPINION.

BARBER, Judge, with whom concurs SMITH, Judge, dissenting:

The merchandise in this case is commonly known as rosin, was imported from London, England, in barrels, and entered at the port of Chicago early in 1910. We understand it was produced in France. It was assessed for duty under paragraph 20 of the tariff act of August 5, 1909, at the rate of one-fourth of 1 cent per pound and 10 per cent ad valorem in addition. It was claimed to be entitled to free entry under paragraph 559 of the same act. Other claims are made in the protest, but are not relied upon here.

Just how the rosin of this importation was made the evidence does not disclose. From what is termed "Collective Exhibit 1," which was received without objection by the board, it appears that rosin is produced in France in the following manner:

The raw rosin or "gemme" (gum of trees) is harvested in pots placed near the lower part of incisions made in seaside pines.

This matter, which contains a certain proportion of water and impurities, such as wood shavings, pine needles, and insects, is brought in barrels to the works, which are located near the place of production.

Such works consist of boilers, used for the purpose of melting the "gemme" (gum of trees) in order to remove therefrom all the impurities contained therein, and of stills (alembics) of various systems for extracting by means of distillation the oil of turpentine which the "gemme" (gum of trees or resin) contains. The residuum left from said distillation leaves then the still (alembic), passes through sieves and forms the so-called colophony or rosin ("Brai").

Its color is clear during the first months of the harvest, April, May and June, and it becomes dark during the end of the campaign in the months of October and November.

The colophony is thereupon placed in barrels of pine wood which contain, in general, 3 to 400 kilograms of matter.

Both the importer and the Government introduced evidence tending to show that in the southern part of the United States rosin is produced in the following manner: Incisions are made in the trunks of certain species of pine trees, the sap flowing therefrom is caught in receptacles at the foot of the tree, at intervals these receptacles are emptied, the sap therein put into barrels and transported to and placed in stills which often are from 25 to 100 miles away from the trees. As placed in the stills this sap contains dirt, chips, leaves, and pine needles. The sap in this condition is subjected to a process of distillation, as a result of which there passes from it a vapor which is conducted through pipes submerged in cold water, resulting in a condensation of the vapor which then becomes fluid turpentine or oil of turpentine. After the distillation is accomplished the residuum in the retort of the still is of a consistency similar to ordinary molasses and is unstrained rosin. If it is sold in this condition it is allowed to flow from the still into a vat and from there dipped into barrels in which it is sold and shipped. These barrels contain about 280 pounds of the product. This is the unstrained rosin of commerce. If it is to be sold as strained rosin it is while hot strained by passing it through three separate wire strainers or screens, the first of coarse mesh, the second finer, and the third finer still, and over the last strainer are placed several layers of cotton or cotton batting which are designed to remove all impurities and to produce pure rosin. This product is the strained rosin of commerce and is classified and graded as to its color, the lightest color commanding the highest price. The importation here is one of the highest of these grades and is ready without any further treatment to be devoted to the purposes for which pure rosin is used. The sap as it comes from the trees, strictly speaking, is oleoresin, but is perhaps more commonly known as crude turpentine.

The purpose and result of the straining process as before described is to remove the dirt, chips, leaves, and other impurities and to make pure rosin. The color is dependent upon various things, amongst them the degree of heat used in distillation, the time of year when the oleoresin is taken from the tree, the age of the tree from which it is taken, and the care with which it is strained. The more completely all impurities are removed the lighter the color of the rosin, and if too much heat is applied in the process of distillation it tends to darken the color of the rosin product.

It appears that at the port of Chicago from some time in 1888 until some time in October, 1909, merchandise similar to the rosin in this case was admitted to entry free of duty as a gum resin under the paragraphs of previous tariff laws which related to the same articles referred to in paragraph 559 below quoted, and that a soap manufacturer doing business at Philadelphia imported it in the four or five

years prior to April, 1910, also free of duty, but where his importations were made does not otherwise appear.

We insert here paragraphs 20 and 559, respectively, of the tariff act of August 5, 1909:

20. Drugs, such as barks, beans, berries, balsams, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, gums and gum resin, herbs, leaves, lichens, mosses, nuts, nutgalls, roots, stems, spices, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and woods used expressly for dyeing or tanning; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for in this section, but which are advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, one-fourth of one cent per pound, and in addition thereto ten per centum ad valorem: *Provided,* That no article containing alcohol, or in the preparation of which alcohol is used, shall be classified for duty under this paragraph.

559. Drugs, such as barks, beans, berries, balsams, buds, bulbs, bulbous roots excrescences, fruits, flowers, dried fibers, dried insects, grains, gums, gum resin, herbs, leaves, lichens, mosses, nuts, nutgalls, roots, stems, spices, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and woods used expressly for dyeing or tanning; any of the foregoing which are natural and uncompounded drugs and not edible and not specially provided for in this section, and are in a crude state, not advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided,* That no article containing alcohol, or in the preparation of which alcohol is used, shall be admitted free of duty under this paragraph.

Paragraph 20 of the act of July 24, 1897, which is the immediate predecessor of paragraph 20 above quoted, instead of the words "but which are advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture," contained these words, "which are advanced in value or condition by refining, grinding, or other process." Paragraph 548 of the act of 1897, which is the immediate predecessor of paragraph 559 above quoted, contained the words "in a crude state and not advanced in value or condition by refining, grinding, or other process," instead of the words, "in a crude state, not advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture," and these changes in the respective paragraphs are the only ones material to consider in the disposition of this case, but it may be observed that provisions similar to those of the act of 1897 are found in the corresponding paragraphs as far back as 1883.

Under the provisions of the respective paragraphs prior to the act of 1890, there had been much litigation and with the result, as we view it, that no general principle could be deduced therefrom which might be applied in the classification of merchandise seemingly covered by the paragraphs.

To illustrate: The juice which exuded from the papaw melon, after it had coagulated in small lumps thereon, was scraped from the melon, spread upon a board with another board over it, then subjected to a sort of grinding process by which the lumps were reduced to powder, in which condition it was imported, was held not to be entitled to free entry as a crude drug. United States *v.* American Ferment Co. (108 Fed. Rep., 802). Cassia flowers, pulverized, but in what manner not appearing, received the same classification. (T. D. 22653.) So also as to ginseng root, cleansed (T. D. 24883). And likewise as to dyewood, known as fustic, which had been cut into chips (T. D. 17172).

On the other hand, in United States *v.* Godwin (91 Fed. Rep., 753), juice of the papaw melon, caught in pans, dried in the sun, and sifted to take out foreign substances, in which resulting condition it was not fit for medicine, but from which medicine was prepared, was held free of duty. The same treatment was accorded to Guarana paste made from the seeds of *paullinia sorbilis*, produced by shelling the seeds, moistening them in water, removing a papery film, and then pounding them and adding water to reduce the substance to a semi-liquid consistency, it appearing that this was the crudest form in which the article was imported. Cowl *v.* United States (124 Fed. Rep., 475). And in T. D. 27162 Canada balsam, which after it had been drawn from the tree was submitted to a straining process for the purpose of eliminating therefrom bits of sticks, bark, chips, and dirt, was also given free entry. The board in this decision, referring to a prior case, said:

The board would construe the words "advanced in value by refining, grinding, or other process," to mean advanced in value beyond the crudest form known to commerce. There may be exceptions, but it would seem to be the rule that an article is crude when it is in the crudest form known to commerce. There must be some starting point for the advancing process.

Other decisions upon this subject, illustrating the point, may be found in Notes on Tariff Revision (pp. 30 and 31, 703 and 704), all of which were before Congress for consideration prior to the enactment of the tariff act of 1909.

We think it was undoubtedly the intention of Congress in revising these paragraphs to substitute for the varying interpretations of the word "crude" a certain fixed test, or standard, of its own, by which liability to or exemption from duty should be determined, and to make it impossible that one test which had theretofore been applied should be whether or not the merchandise was in the crudest form in which it had been customary to import the same.

This new test would seem to require that the article should be a natural and uncompounded drug, not edible. If such a drug is advanced in value or condition by any process or treatment whatever

beyond that essential to its proper packing and the prevention of decay or deterioration pending manufacture it is dutiable under paragraph 20. If, on the other hand, such natural and uncompounded drugs, not edible, are in a crude state, not advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing and the prevention of decay or deterioration thereof pending manufacture, they are entitled to free entry.

The importer contends in substance as follows: That this importation is a crude article; that the processes to which it has been subjected before importation are only such as are necessary to prevent deterioration pending manufacture, which he says should be applied to the particular manufacture for which the merchandise is designed; that an article may be used for some purposes for which its fitness for use will be in nowise dependent upon its. purity; that on the other hand it may be used for other purposes for which its usefulness and value will be largely deteriorated if it is not free from impurities before being packed for shipment; that it was not the intent of Congress that drugs should be injured for one purpose because the treatment applied to prevent them from injury might be unnecessary when they were used for other purposes, and flatly declares that—

The uncontradicted testimony in this case is that if the rosin after separation from the spirits of turpentine is not strained so as to remove the dirt, chips, leaves, and other substances it will during the process of transportation become darker in color and therefore be of a lower grade in quality and price and less suitable for the use of the soap manufacturer.

The corollary to his position, as stated, would seem to be this: If it should appear that rosin before being strained and purified was found to be an article of commerce and a. crude drug and as such entitled to free entry under paragraph 559, if imported for purposes to which it could be used in that condition, that, nevertheless, when it appeared that an importation was designed to be devoted to some . purpose for which it could not be used in that condition, in the latter case it should, nevertheless, be entitled to free entry, although it had been purified like the importation at bar. In other words, the question of whether an article was entitled to free entry as a drug under paragraph 559 would be made to depend upon the use to which it was to be applied.

The record in this case is absolutely barren of any fact or suggestion that tends to show that the importation was made for the purposes of making soap, or that it was imported for any particular purpose or destined for any special use, and therefore, tested by his own claim, if it shall be found that the unstrained, unpurified rosin is a subject of commerce, the importer, it would seem, ought not to prevail in this case.

As to his claim that the uncontradicted testimony in the case shows as above stated, an examination of the record satisfies us that it cannot be maintained. We think the evidence establishes beyond question that thousands of barrels of unstrained rosin are annually brought from southern ports of this country to New York and elsewhere and kept in its unstrained condition for months in the original barrels in which it was shipped without any deterioration whatever. Its selling price is not thereby decreased, and witnesses for the importer as well as for the Government agree in saying that the real object in straining the rosin is to enhance the value of the product. In addition to this it might almost seem to be common knowledge that the presence of chips, leaves, dirt, or other foreign substances would be unlikely to change the color of the solid rosin which surrounds such refuse matter.

The board did not find that the rosin deteriorated pending manufacture if it was not strained, as claimed by the importer, but contented itself by holding that the rosin in this case, which, as already stated, has been classified and graded as to color and is one of the highest grades commanding the highest prices and ready without any further treatment to be devoted to the purposes to which pure rosin is used, was a natural and uncompounded drug in a crude state not advanced in value by any process whatever.

We proceed, therefore, to consider whether in any event this rosin is within the class of natural uncompounded drugs in a crude state not advanced in value or condition by any process whatever within the meaning of the paragraph. It surely is not in its natural state because as it exists in nature it is held in solution in the oil of turpentine from which it is separated by distillation. The processes of nature cannot separate the two and preserve both and artificial processes must be resorted to in order to accomplish that result. If the oleoresin, the crude turpentine, be exposed to the air long enough doubtless the volatile oil of turpentine would all disappear, but the residuum would be unstrained, ungraded, and impure rosin. To produce from that residuum the importation here, if it could be produced therefrom, it would be necessary to melt, strain, and grade it.

Without entering into any exhaustive discussion of the meaning of the word "crude" as used in paragraph 559, it may be observed that this word in its ordinary sense and as applicable to its use in the paragraph means a thing in a raw or unprepared state, not fitted for use by cooking, manufacture, or the like and not altered, refined, or prepared by any artificial process. See Century Dictionary.

We are unable to see how the importation here answers the call of this definition. It has been artificially produced, it has been subjected to artificial heat, melted, purified, and graded and these processes have been resorted to for the purpose of producing and have

produced an article prepared for a use by artificial means from an article that in its natural state could not be used for the purpose to which it may now be devoted. These processes have designedly been applied to produce these results and to enhance the value of the product.

If the importation is in a crude state not advanced in value or condition by any process or treatment whatever beyond that essential to prevent deterioration pending manufacture within the meaning of paragraph 559 and thereby entitled to free entry, we see no escape from the conclusion that no rosin can be imported which should not receive a like favor. It might, we think, with much force be claimed that the crude turpentine answered to the requirements of the paragraph under consideration or that the unstrained resin remaining after the processes of distillation had been employed was such an article, but that may not be necessary to decide here.

Both the foregoing articles are in large quantities the subject of trade and commerce in this country, one of the Government's witnesses alone shipping from southern ports over 1,000 barrels of the former and another 50,000 barrels of the latter annually. But it is urged that the first appearance of rosin as a separate article of commerce is after the oleoresin has been subjected to the processes of distillation and that because when the rosin first so appears it contains chips, dirt, leaves, and other impurities; that the removal of the same therefrom by the straining processes and the contemporaneous grading of the rosin product does not deprive the graded rosin of its character as a crude article within the meaning of the paragraph. In other words, it is said that the rosin which first appears after the distillation of the oleoresin is a crude product whether strained or unstrained and whether graded or ungraded.

What we have already said indicates that this contention can not be upheld, and in addition thereto it may be observed that every article named as a drug in paragraph 559 appears to be a substance as found in a state of nature and not a thing or substance produced by any process of distillation or other processes whatever. To illustrate: The words barks, beans, berries, balsams, insects, leaves, lichens, mosses, etc., therein used all indicate a thing which is a natural product and ordinarily when obtained in their crude state would require no treatment whatever except drying or shaping to prepare them for shipment or to preserve them from deterioration or decay pending manufacture. They would not, it seems, require to be classified, purified, or graded for that purpose.

This view of the law makes it unnecessary to consider claims of the importer as to the effect of the classification of this merchandise at Chicago or elsewhere, as above stated.

We hold the rosin in this case is not entitled to free entry under paragraph 559 and in our opinion the judgment of the Board of General Appraisers should be reversed.