(C. D. 1514)

JACOBUS F. FRANK *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 8, 1953)

*Eugene R. Pickrell* (*Eugene R. Pickrell and Michael Stramiello, Jr.*, of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before OLIVER and MOLLISON, Judges

MOLLISON, Judge: The merchandise the subject of this protest is described on the invoice as "RUBBERPOWDER (MEALORUB)," and was assessed with duty at the rate of 25 per centum ad valorem under the provisions of paragraph 1537 (b) of the Tariff Act of 1930 which read as follows:

Manufactures of india rubber or gutta-percha, or of which these substances or either of them is the component material of chief value, not specially provided for, 25 per centum ad valorem; * * *.

Plaintiff protested the foregoing classification and assessment of duty by the collector, claiming that the merchandise is entitled to free entry under the provision in paragraph 1697 of the same act for—

India rubber * * * crude * * *.

Although chief reliance is placed in the foregoing claim, a further claim that the merchandise is dutiable at the rate of 10 or 20 per centum ad valorem under the catch-all provision for nonenumerated unmanufactured or manufactured articles in paragraph 1558 was not abandoned, but is pressed as an alternative claim.

Samples representative of the merchandise involved in its imported condition are before us as plaintiff's exhibit 1 and defendant's exhibit B. Although described as "powdered," the merchandise, as represented by the foregoing exhibits, resembles small crumbs or granules in appearance, and approximates light-brown sugar in both size of the particles and in color.

There is no dispute that "Mealorub" is a trade name, coined by the producer for the particular product, and although it was variously referred to by witnesses as "rubber powder" or "powdered rubber" there is no other indication that these terms, or either of them, are its common name or that it generally bears any name other than the trade name. It will be referred to herein as "Mealorub."

The means by which the merchandise was brought to the condition in which it was imported are not in dispute and were as follows:

Rubber trees were tapped in the morning, the resulting juice being known as field latex. The fresh field latex was collected and brought to the factory, where it was bottled, screened (presumably meaning filtered), and then placed into a so-called reaction vessel, which seems to have been some sort of kettle. To the field latex in the reaction vessel were added ammonia, a dispersion of sulfur, zinc oxide, and an accelerator. The mixture was stirred and heated, and from time to time samples were drawn off for testing purposes. After about 1½ hours of this process at a temperature of 80° centigrade, formic acid was added to the mixture, which resulted in the coagulation (i. e., thickening or solidification) of the mass and the formation of a flocculate (i. e., aggregation into small lumps). As soon as the coagulant was flocculated, the reaction was stopped, and the coagulant was allowed to stand overnight. The following morning the coagulant was rinsed with water several times, washed, and then pressed to remove all the water. It was then broken up into the crumb or granule form by means of a simple hammer mill, after which it was dried and placed into bags for shipment.

The record shows that field latex, as obtained from the rubber tree, contains small particles of rubber, as well as certain nonrubber constituents, among which are certain lipoids (fatlike substances containing protein), sugars, and salts. These nonrubber constituents, naturally present in the latex, cause deterioration of the latex and of the rubber particles contained therein if not removed or neutralized within a very short time, i. e., less than a day, after the fresh field latex is obtained from the trees.

The record also shows that the particles of rubber naturally present in fresh field latex are from 0.2 to 5 microns in size, while the particles of rubber in the product "Mealorub" are from 20 to 500 microns in size. It therefore follows that the process employed in the production of "Mealorub" from fresh field latex has, in part, the effect of causing

a clumping together or conglomeration of the original particles of rubber in the latex to form particles of rubber of larger size. The undisputed facts show that the remaining effects of the process is to cause the proteins in the latex to coagulate and form a protective skin around these larger sized rubber particles.

The skin, with the particle of rubber inside, forms each crumb or granule of the imported product. Each crumb or granule, after formation, is held loosely to the others in the mass by reason of the pressure used to extract the water, but the simple operation of a hammer mill, or even a crumpling with the fingers, serves to separate the crumbs or granules, which, except for the pressure, would have no coherence with each other.

There is no dispute that, although the merchandise is susceptible of many uses, some of which have been explored experimentally, its chief use is as an admixture with asphalt and gravel in road surfacing. Its other uses at the present time are for incorporation into what are known as joint compounds, poured between concrete slabs to prevent moisture damage, and for admixture with asphalt for roofing compounds.

In meeting his twofold burden of establishing the incorrectness of the classification adopted by the collector, and the correctness of that claimed by him, plaintiff contends that the "Mealorub" at bar is not classifiable under the provision for "Manufactures of india rubber" for the reason that the rubber contained in the imported article never had a previous existence as such prior to its manufacture into "Mealorub." This contention is based upon the so-called "preexistence doctrine," which is well established in customs jurisprudence. In the case of *Cohn & Lewis* v. *United States*, 25 C. C. P. A. (Customs) 220, T. D. 49335, the doctrine is expressed as follows:

* * * it has been a uniform and well-settled holding that the language "made of" or "manufactured of" presupposes that the material of which the article is made or manufactured exists before the article itself comes into existence.

In support of the other portion of his burden, i. e., that his claimed classification is correct, plaintiff contends that the imported "Mealorub" is produced by processing the latex found in the rubber tree in substantially the same way as commercially known forms of crude rubber are produced, i. e., crepe rubber, smoked sheets, and concentrated latex. Further, it is contended that the process which results in the production of "Mealorub" from fresh field latex is analogous to those processes of extraction, etc., of natural substances whereby the crudest form of the substance known to commerce is produced, citing in this connection *Magnus, Mabee & Reynard, Inc.* v. *United States*, 39 C. C. P. A. (Customs) 1, C. A. D. 445, relating to crude and advanced drugs.

It is the defendant's position that the "Mealorub" at bar was produced by a manufacturing process known as vulcanization, whereby it acquired a distinctive name, character, and use different from those of the material, rubber.

Although it is nowhere expressly stipulated, agreed, or conceded, we think, based upon statements appearing in the briefs filed by counsel for both parties, that it is undisputed that "Mealorub" is produced directly from field latex without first making the forms of crude rubber known to commerce—in other words, that in the process used to produce "Mealorub" there is not produced an intermediate product which might be considered a form of crude rubber. Thus, at page 26 of the brief filed on behalf of plaintiff it is said:

> There is no evidence within the record to remotely suggest that the process used to obtain the imported product from field latex produced an intermediate product which might be considered a crude form of rubber; rather it is established that "Mealorub" was made directly from field latex by a process which was [a] continuous one employed until "Mealorub" appeared as the first completed product which was suitable for use and known to commerce as rubber.

and at page 4 of the brief filed on behalf of the defendant it is said:

> In the case at bar it is quite true that mealorub is produced directly from field latex without first making the forms of crude rubber such as concentrated latex, crepe sheets, and smoked sheets known to commerce.

These statements are amply justified by the record. It follows, therefore, that the "Mealorub" at bar was not produced from rubber which had an existence as rubber prior to its appearance in the imported product. The material used in the production of "Mealorub" is fresh field latex, which, in a tariff sense, at least, is not crude rubber because in the form of fresh field latex it is not known to commerce as crude rubber.

We therefore hold that the imported product "Mealorub" is not properly classifiable under the provision for "Manufactures of india rubber." However, the provision under which the collector classified the merchandise also provides for—

> Manufactures * * * of which [india rubber] * * * is the component material of chief value, not specially provided for * * *.

Here, it would appear, the preexistence doctrine has no application, for the question is not whether the imported product was manufactured *of* india rubber, but whether (1) it is a manufacture and (2) as the product appears in its imported form, india rubber is the component material of chief value. Paragraph 1559 of the Tariff Act of 1930 reads in part as follows:

> * * * and the words "component material of chief value," wherever used in this Act, shall be held to mean that component material which shall exceed in value any other single component material of the article; and the value of each component material shall be determined by the ascertained value of such material in its condition as found in the article.

No evidence was offered bearing upon the question of the component material of chief value of "Mealorub," although it appears beyond question that such material is rubber, or, as it is denominated in the tariff act, india rubber. By virtue of the presumption of correctness which attends the classification made by the collector, and which extends to all of the findings necessary to support such classification, *if "Mealorub" is a manufacture*, it is a manufacture of which india rubber is the component material of chief value.

We think at this point it would be well, in order to gain an objective viewpoint of the situation, to examine the provisions of the tariff act insofar as they relate to rubber or rubber products. Paragraph 1697, under which plaintiff claims, evinces the congressional plan to accord free entry to rubber in the crude state. Paragraph 1537 (b), under which the merchandise was classified, evinces the congressional plan to impose a duty upon rubber when in the form of manufactured articles, that is to say, rubber when its identity as a material has been subordinated because it has acquired by a manufacturing process or processes new and superior characteristics which it did not possess as a material, and which are generally evidenced by a new name, character, and use.

In between the states or conditions of rubber represented by these two tariff provisions there is a state or condition of rubber which might be called rubber, advanced, that is to say, rubber which is still a material, but which has, by a manufacturing process or processes, or by manufacturing effort, been taken out of the crude state, or advanced to a condition beyond that state.

Such a state or condition of rubber is a recognizable one, even though no specific enumeration of it is made in the tariff law. In *United States* v. *Wilkinson Process Rubber Sales Corp.*, 22 C. C. P. A. (Customs) 60, T. D. 47051, a material known as "linatex," consisting of rubber which had been treated by a patented process which gave it many, if not all, of the characteristics of vulcanized rubber, was held to be removed from the state of crude rubber but not so changed in character as to acquire the status of a manufacture.

We think this is the situation of the "Mealorub" at bar. The record shows that in its imported condition the product is not dedicated to any specific use or class of uses, but is susceptible of many uses, all of which are those of rubber as a material. The uses to which it is put at the present time, including its chief use, are not based upon any character and use distinct from those which it possesses as a rubber material. These facts establish that the merchandise is not a "manufacture." *United States* v. *Wilkinson Process Rubber Sales Corp.*, *supra*.

Neither is it crude rubber. The record shows that in the production of "Mealorub" there are used chemical and physical factors (to wit, sulfur, an accelerator, and heat), the effect of which are to initially

or partially vulcanize the product. The evidence offered by the defendant shows that "Mealorub" does not respond to certain tests for crude rubber and would seem to indicate that it has characteristics lying somewhere between those of crude rubber and vulcanized rubber.

It is the contention of the plaintiff that the process of obtaining the imported product "Mealorub" is merely an isolation process to obtain the rubber constituents of the latex and to put them in condition for transportation, storage, and use as a material. Citing numerous cases, among them, *United States* v. *Godwin et al.*, 91 Fed. Rep. 753; *United States* v. *Sheldon & Co.*, 2 Ct. Cust. Appls. 485, T. D. 32245; and *Hampton, Jr., & Co.* v. *United States*, 6 Ct. Cust. Appls. 392, T. D. 35926, the plaintiff contends for the application of the following rule, quoted in the case last named:

* * * It may be generally said that it has been uniformly held in customs interpretation that the application of processes necessary to produce an article from its native condition and to bring it into a condition that it may be imported, without affecting its *per se* character, is not regarded either as a manufacturing process or as a process advancing it in value or condition.

The record does not establish that the chemical and physical factors referred to hereinbefore were necessary for the purpose of isolating the rubber constituents of the latex and to put them in condition for transportation, storage, and use as a crude rubber material. On the contrary, it is a reasonable inference from the evidence offered that they were responsible for certain of the characteristics of vulcanized rubber which appear in the imported product.

It therefore appears that such factors were used, not merely incident to a process of getting the rubber out of the latex and into its crudest commercial form, but were deliberately employed to achieve a certain desired effect and produce a rubber material having certain characteristics not ordinarily found in crude rubber. In these circumstances, there being no more specific provision in the tariff act therefor, the product is properly classifiable under the catch-all provision in paragraph 1558 for "articles manufactured, in whole or in part, not specially provided for" and that claim in the protest will be sustained. *United States* v. *Wilkinson Process Rubber Sales Corp.*, *supra*.

Judgment will issue accordingly.