(C. D. 806)

DIXIE VENEER CO., INC., ET AL. *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 13, 1943)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiffs. *Paul P. Rao,* Assistant Attorney General (*Daniel G. McGrath* and *Robert C. O'Grady,* special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges; COLE, J., dissenting

WALKER, Judge: The merchandise the subject of these protests is of two kinds: That covered by protest 44177–K consists of what are described on the invoice as "flitches," while that covered by protest 33279–K is described as "New Guinea Logs (Halved)." The former were classified under the provisions of paragraph 1803 (1) of the Tariff Act of 1930, while the latter were classified under

subparagraph (2) of that paragraph, both free of duty thereunder, but a tax at the rate of $1.50 per thousand feet, board measure, was imposed on both classes of merchandise under the provision in section 601 (c) (6) of the Revenue Act of 1932 (section 3424, Internal Revenue Code), as amended by section 704 of the Revenue Act of 1938 and the Canadian Trade Agreement, T. D. 49752, for "sawed timber." The protest in each case is directed against this latter assessment, the contention being that the articles involved are not "sawed timber."

The evidence indicates that the so-called flitches were produced in the following manner: The trees from which they were made averaged about 10 feet in girth. The trees were cut down and made into logs. The logs were sawn down the middle, and each half also sawn down the middle to make four quarters in all. These were then examined, and the heart and sapwood, the latter being the whitewood directly underneath the bark, and, according to one of plaintiffs' witnesses, not considered a useful part of the wood, are trimmed off, as well as any imperfect section, the latter being caused by worm holes, rot, etc.

The flitches are of varying lengths, and, because of the various trimmings depending on the characteristics of the individual flitch, are not uniform as to other dimensions or number of sides, nor is any effort made to make the sides or edges parallel. Sample cross sections of two flitches are before us as illustrative exhibits A and B, the former having eight sides and the latter six sides, all irregular, not counting the ends.

The half logs are, in the words of one of plaintiffs' witnesses, "merely a cylindrical log which has been cut straight down the center of the log, from one end to the other, and made to open into two halves." These are then inspected, and if found to contain borers or worms are rejected and not shipped, only sound half logs being shipped.

After importation the merchandise is manufactured by various processes of sawing and slicing into veneers.

Briefly stated, it is the contention of the plaintiffs that such sawing as was done on the logs which produced the instant merchandise did not convert them into sawed timber, but merely served to separate the useful from the nonuseful portions of the logs, and facilitated their transportation, citing in this connection many of the cases wherein various substances which had been subjected to processes having for their purpose either to get the substance by itself or to facilitate its transportation were held to be unmanufactured or crude. (*Doap Leun Hong Co.* v. *United States*, 19 C. C. P. A. 313, T. D. 45481; *Vandegrift & Co.* v. *United States*, 13 Ct. Cust. Appls. 30, T. D. 40865; *Cone & Co. (Inc.)* v. *United States*, 14 id. 133, T. D. 41671, and *Lackawanna Steel Co. et al.* v. *United States*, 10 id. 93, T. D. 38359.)

On the other hand, it is the contention of the defendant that no matter what the purpose of the sawing was, it converted the logs into sawed timber, which is made dutiable by the revenue act, *supra*.

The term "timber" has broad significance, but we think the following from Webster's New International Dictionary, 2nd Ed., 1935, expresses the common understanding of the term:

2. * * *. (b) Wood suitable for building houses, bridges, ships, etc., whether on the tree or cut and seasoned; wood used in carpentry and joinery. 3. A squared or dressed piece of wood, esp. one of comparatively large width and thickness (in the United States, four inches or more), ready for use or already forming part of a structure, as timbers of a roof, bridge or floor timbers.

"Timber," therefore, according to subdivision 2, above, includes the logs from which the instant flitches and half logs were made. Indeed, logs have been held to be dutiable under a provision for "round unmanufactured timber" by this and other courts. (*A. Guthrie & Co.* v. *United States*, T. D. 27744; *Perfection Pile-Preserving Co.* v. *United States*, 147 Fed. 922, T. D. 26776, and *United States* v. *MacNaughton*, 5 Ct. Cust. Appls. 114, T. D. 34166.)

At first glance this would seem to favor the contention of the defendant, for there is no question that the articles at bar were brought to their present condition by sawing logs. However, in our view the term "sawed timber" as used in the revenue act, *supra*, relates to wood of the kind referred to under subdivision 3 of the dictionary definition given above, that is to say, timber which has been sawed for the purpose of squaring or dressing the same, i. e., advancing it from the rough condition, as distinguished from such sawing as would be done to eliminate imperfections for the purpose of getting the wood by itself and facilitating its transportation. We do not agree with the contention of the defendant that any sawing, regardless of purpose or effect, transforms logs into sawed timber, for if this were so, the mere sawing of the logs to length would make them "sawed timber."

Our view is supported by the testimony of L. A. Daugherty, the manager of the wholesale lumber department of a lumber company. In his experience of 30 years in manufacturing and selling lumber and timber, he said, the term "sawed timber" referred to wood having two parallel sides and two parallel edges, or in other words, having uniform dimensions throughout the length of the piece.

Our view is also supported by the decision of the Third Division of this court in the case of *Lunham & Moore* v. *United States*, T. D. 43849, 57 Treas. Dec. 244. There the merchandise consisted of talc which had been taken from the quarries in blocks weighing from 200 to 300 kilos, but which, prior to exportation and for the purposes of economical transportation, had been sawed to sizes of 30 to 40 kilos and smaller. In overruling the classification thereof by the collector as "talc * * * sawed" the court said:

We think the contention of the plaintiffs is well taken. We do not think it was the legislative intent to include the merchandise in the condition as imported under the words "cut or sawed." The testimony shows that the merchandise, as imported, is, in this country cut or sawed prior to its manufacture into other articles, and we think it is this cutting or sawing that the statute contemplates. In the condition as imported, it is the crude material out of which the manufacturer makes the various articles of commerce. It is in irregular blocks. The testimony shows that the cutting at the mine in no way helps the manufacturing process. It saves the manufacturer nothing. * * *.

We therefore hold that the merchandise at bar is not "sawed timber," and it is therefore not dutiable under the provision in section 601 (c) (6) of the revenue act therefor. The claim in each of the protests for entry free of the tax imposed under said section is therefore sustained, and judgment will issue accordingly.

### DISSENTING OPINION

COLE, Judge: The court's decision, holding the instant merchandise is not "sawed timber," is based on the finding that the sawing of the logs, from which the imported merchandise was made, was done "to eliminate imperfections for the purpose of getting the wood by itself and facilitating its transportation." I am constrained to dissent from this factual finding as well as from the legal conclusion.

The use of the phrase, "for the purpose of getting the wood by itself," relates to a doctrine enunciated as early as January 27, 1899, in *United States* v. *Godwin et al.*, 91 Fed. 753, which involved certain powder made from the juice of the papaw melon, which had been dried and purified. The court held that drying in the sun and sifting out mechanical impurities "had no effect upon the article itself, other than to get it by itself," and accordingly held the merchandise to be properly classifiable as a crude drug. The above-mentioned case is cited with approval in *United States* v. *Sheldon & Co.*, 2 Ct. Cust. Appls. 485, T. D. 32245, which is greatly stressed in *Doap Leun Hong Co.* v. *United States*, 19 C. C. P. A. 313, T. D. 45481, the latest authority given in the court's opinion. The principle has been followed under a long line of uniform decisions, but in all instances the issue related to a commodity which had been subjected to cleaning, straining, drying, and separation processes that did not affect the merchandise *per se*.

The rule has no application here. The walnut flitches covered by protest 44177–K were obtained by sawing logs in quarters and trimming them of undesirable parts. The New Guinea logs involved in protest 33279–K are sawed halves with decayed portions removed therefrom. The uncontradicted testimony shows that the manipulation of both classes of merchandise was for the specific purpose of bringing the wood to a condition suitable for further manufacture into veneer, its only use in this country. Obviously, the removal of useless

parts of the logs facilitated transportation of the goods and reduced the freight charges, but this condition is not 'to be regarded as a controlling element in determination of the present issue. The important factor is that the processing of the logs, which included sawing, in the country of exportation materially advanced the condition of the wood toward its ultimate use here.

Section 704 of the Revenue Act of 1938 (26 U. S. C. 1940 ed. §3424) reads, in part, as follows:

(a) Lumber, rough, or planed or dressed on óne or more sides, except flooring made of maple (except Japanese maple), birch, and beech, $3 per thousand feet, board measure; but the tax on the articles described in this section shall apply only with respect to the importation of such articles.  *  *  *  .
(b) In determining board measure for the purposes of this section no deduction shall be made on account of planing, tonguing, and grooving.  *As used in this section, the term "lumber" includes sawed timber.*  *  *  *  .

The last sentence (italicized) in the above quotation is new language. It did not appear in the predecessor section 601 (c) (6) of the Revenue Act of 1932 (47 Stat. 260) which, except for the statutory definition referred to, was identical in language with the quoted provision from section 704, *supra.*

In *Laurence Phillips Lumber Co* v. *United States*, 68 Treas. Dec. 104, T. D. 47810, decided on July 16, 1935, affirmed on rehearing in *Laurence Phillips Lumber Co.* v. *United States*, 73 Treas. Dec. 995, T. D. 49624, of June 17, 1938, which arose under the earlier law, this court, speaking through Judge McClelland, construed the term "lumber" for the purposes of section 601 (c) (6), *supra.* The merchandise in question there consisted of some 92 pieces of wood, varying in cross section from 2 x 4 inches to 6 x 18 inches. It was assessed with the revenue tax under said section 601 (c) (6), and was claimed to be exempt therefrom on the ground it was timber and not lumber. The court held, on the evidence introduced in the case, that "in order to be classed as timber, wood must be not less than 6 inches on any one side," and accordingly sustained the protest only as to the merchandise (six pieces) "within the dimensions required for timber."

It is significant that shortly after the first decision in the *Phillips Lumber Co.* litigation and while decision on rehearing of the case was pending, Congress amended the Revenue Act of 1932 by extending the meaning of the term "lumber" as used in section 601 (c) (6) thereof to include sawed timber. Hence, it is fair to say that if the statute, as amended in 1938, had been in existence at the time the *Phillips Lumber Co.* case, *supra,* was before the court, there would have been no question whatsoever as to the proper classification to be applied. Whether or not the action in placing sawed

timber under the category of "lumber" was influenced by this decision, I do not know, but it seems proper to impute knowledge thereof to Congress.

The term "sawed timber" as it is used in section 704, *supra*, is unrestricted and without qualification, and it should be given broad construction. The court does not do so. It gives the term a very narrow interpretation, and in doing so has considered only a brief subdivision of one dictionary definition. A salient feature of the court's opinion, and one which furnishes a basis to give proper effect to the provisions of section 704, *supra*, is the reference therein, citing authorities, to the tariff classification of logs as "round unmanufactured timber." Since the so-called flitches and New Guinea halves in question are in fact sawed logs, they are clearly embraced within the provisions of the said section, and accordingly subject to the revenue tax imposed by the collector.

The court places much reliance on the testimony of L. A. Daugherty for the supporting evidence to the position it takes. This witness, however, stated he had never seen, in all his 30 years' experience, any sawed timber or lumber that resembled illustrative exhibits A and B, except at a veneer mill. This confirms, definitely, the fact that the lumber, as imported, was in shape for use, exclusively, as he indicated. The same witness furnished a definition of a flitch and admitted that flitches such as he sold were considered lumber, and that he did not deal in commodities like the exhibits in this case (illustrative exhibits A and B) which are commonly known as flitches. His testimony is too glaringly minus of that knowledge and experience with merchandise like illustrative exhibits A and B that should be present before his contribution to such litigation may be accepted as controlling the decision in a case of this importance.

In the case of *Lunham & Moore* v. *United States* (57 Treas. Dec. 244, T. D. 43849), cited in the court's opinion, the issue involved was whether the imported talc was properly classifiable under a provision for "cut or sawed," as fixed by the collector, or "crude and unground," as claimed by the importer. The quotation set forth in the court's opinion relates to factual findings, without mention of the consequent conclusion of law, which the court expressed as follows:

We are of the opinion that by the words "crude and unground" contained in paragraph 209, *supra*, as descriptive of talc, Congress meant talc which had not been advanced in condition beyond the point necessary for its economic transportation, and by the words "cut or sawed" meant to include later manufacturing processes.

That judicial interpretation of the term "sawed" supports my position here.

It is the different factual basis that distinguishes the cited case from this. There, the court emphasized the fact that the merchan-

dise was sawed in convenient smaller sizes for the sole purpose of enabling it to be transported by means of small trucks drawn by oxen from the quarry at the top of a mountain to a point at the base thereof where it was loaded in automobile trucks for further transportation to the railway station. It was not until after the talc was received in this country that it was sawed according to customer's specifications to suit it for its ultimate use in the manufacture of electric insulation and burner tips.

The manipulation in the foreign country of the merchandise involved in the *Lunham & Moore* case, *supra*, is not analogous with the processing applied to the instant merchandise prior to its exportation. In this case, the crude timber—felled trees—is sawed, as directed by the importer, primarily for the purpose of getting the wood into such shape as advances its condition making the finished sawed product suitable for immediate use, upon importation, for veneer, which procedure, according to the testimony, at times results in the tree as initially felled being totally eliminated as timber suitable for veneer and therefore, in the language of the court, "rejected and not shipped." The effect of the operations abroad is that of a manufacturing process, which, under the pronouncement in the *Lunham & Moore* case, *supra*, produces a commodity that has been sawed; in the instant case, sawed timber. If requirements that the talc be cut and prepared in certain prescribed forms before shipment had been enforced by the importer in the cited case, it is difficult to conceive of any finding by the court therein other than the classification I believe applicable here.

The protests should be overruled.