(C. D. 773)

GEO. S. BUSH & CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 26, 1943)

*Lawrence & Tuttle* (*George R. Tuttle* and *Frank L. Lawrence* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Frank X. O'Donnell, Jr.,* special attorney), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: The merchandise in this case consists of oil extracted from dogfish livers. It was assessed with duty at 10 per centum ad valorem under paragraph 34 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 34), as an advanced drug, plus 1½ cents per pound as fish oil, under section 601–c–8 of the Revenue Act of 1932 (26 U. S. C. 1934 ed. § 999a), as amended by section 701 of the Revenue Act of 1936 (26 U. S. C. 1940 ed. § 2491) and modified by the Canadian Trade Agreement, published in T. D. 49752. Plaintiff claims that the merchandise is entitled to free entry under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1669), as a crude drug, and further, that the merchandise is not subject to the revenue tax on the ground "that the provision for fish oil in the revenue act should not be extended to cover a commodity which is a drug."

The latter claim, however, was neither stressed at the trial nor argued in the briefs. Further indication that plaintiff places little, if any, faith in said claim is found in counsel's admission in his opening statement that the principle there involved "is somewhat the same as what was before the court in a case on sunflower-seed oil, which was decided adversely to the importer." The case referred to is *United States* v. *Wecoline Products Corp.,* 29 C. C. P. A. 161, C. A. D. 186, wherein the court held that assessements under the revenue act of 1936 were customs duties, and that the said statute was amendatory

to the Tariff Act of 1930 and did not affect any of the provisions of the earlier law. Accordingly, the assessment under the revenue act was considered by the appellate court in determining the dutiable status of the sunflower oil there involved and found it to be subject to the tax imposed thereunder, although it was entitled to free entry under the Tariff Act of 1930. Directly in point is *Atlantic Coast Fisheries Corp.* v. *United States*, 6 Cust. Ct. 415, C. D. 506, wherein fish-liver oil was held to be subject to the revenue tax, notwithstanding its tariff classification as an advanced drug. The cited cases are controlling for the conclusion that the dogfish-liver oil in question is properly subject to the revenue tax imposed herein, and the court so holds.

Except for the kind of drugs contemplated thereunder, the paragraphs in issue (paragraphs 34 and 1669) are identical. Each contains the following language:

Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; *any of the* foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, * * *; *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

However, paragraph 1669, under which claim is made, is limited to drugs "in a crude state, not advanced in value or condition," while paragraph 34, under which assessment was made, covers drugs "advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture."

It is fundamental that a collector's classification carries the presumption that all facts essential thereto have been established. *United States* v. *Hillier's Son Co., Inc.*, 16 Ct. Cust. Appls. 103, T. D. 42762. It therefore follows, as contended by plaintiff, that the merchandise in question is a drug within the meaning thereof as set forth in paragraphs 34 and 1669, *supra*. Thus the issue presented is limited to the question whether the imported oil, concededly a drug, has been "advanced in value or condition," or is in "a crude state."

Dr. Charles Roy Elsey, an amply qualified biologist and biochemist, employed by the Canadian exporter of the merchandise in question, who supervised processing the dogfish livers to obtain the imported commodity, described the method pursued. It supports this factual finding: that dogfish livers, in fresh condition, are received at the plant in 45-gallon drums; that they are passed through a gear pump, which macerates them, discharging the material into a series of five settling or rendering tanks, where it is subjected to heat treatment, and

as the material enters the first tank, it is treated with live steam, resulting in partial separation of the oil; that then through a process of fractionation by gravity the overflow from each tank passes to the next, and from the last tank in the series the material is carried into a sludging machine which "effects a three-phase gravity separation, delivering the oil out of one spout, the solids out of another, and the water out of another spout"; that this operation, however, is merely a "settling system of gravitation," the real separation being later accomplished by means of a high speed centrifugally operated purifier which finally delivers a product that is 99 per centum pure oil, the imported commodity, and that the residue is recovered and subjected to the treatment originally followed to obtain the oil remaining therein.

The claim of plaintiff is based on the premise that the processing of the dogfish livers merely brought the oil by itself, and did not advance it beyond a crude state. In support of this contention, great reliance is placed upon the case of *United States* v. *Sheldon*, 2 Ct. Cust. Appls. 485, T. D. 32245, wherein gum resin, obtained from oleoresin, was held to be a crude drug. In that case, the court found that the oleoresin or "crude turpentine" is collected in receptacles as it exudes from the trees; that the substance is subjected to a distilling process which vaporizes the turpentine; and that the degree of heat applied to obtain the turpentine is not sufficiently high to distill the resin but merely melts it, allowing it to run off through screens, removing thereform in the straining process "the chips, barks, insects, and dirt which accumulate therein in the reclamation of the oleoresin from the trunk of the tree," before it is finally collected into vats. In reaching its conclusion, the court said:

In this condition, as thus deposited in the kegs of commerce, so far as this record shows, it in no sense differs in the slightest particular from its condition as found in the trunk of the tree. Nor does it differ in the slightest degree from its condition during any step of its processing from the tree to the barrels of commerce save that it is separated by heating from the turpentine in one instance, and separated by screening from dirt and chips in the other instance. It has had no process applied thereto, save that of heating to permit the escape of the turpentine, and, if it may be dignified by the term process, the straining into the vat through sieves * * *. The straining does not advance its crude or natural condition *per se*, but more nearly restores it to its crude or natural condition.

Much was said in that decision concerning screening, cleaning, and straining processes, and numerous authorities were cited supporting the proposition that such processes do not advance an article from a crude condition. Two of the cases mentioned (*United States* v. *Merck*, 66 Fed. 251, and *United States* v. *Godwin*, 91 Fed. 753) are also cited in plaintiff's brief.

The processing of the oleoresin to retain the resin involved in the *Sheldon* case, *supra*, is not comparable with the operations followed to obtain the dogfish-liver oil in question. The heating of the oleoresin

merely isolated the companion substances, turpentine, and resin, and it is important to note that the degree of heat applied was held to a minimum to insure retention of the resin in its crude condition. This was not so with the dogfish livers. At the very outset, they are macerated or crushed. And "crushing," it will be observed, is one of the processes specifically mentioned in paragraph 34 to be regarded as advancing in condition the drugs contemplated thereunder. Following the crushing process, the material is subjected to a treatment with live steam—this application of heat extending over a period of from 40 to 45 minutes—to extract the oil from the liver tissues and water with which it is naturally associated. The three-phase separation process and the final purification, resulting in the imported product, a 99 per centum pure oil, is certainly more than the mere screening or straining process applied to the resin in the *Sheldon* case, *supra*. The instant case is clearly distinguishable from the cited one. The dogfish livers, the natural source of the oil in question, are destroyed, and as imported the oil has become an article of commerce with definite uses, attributed to its vitamin content, as an ingredient in preparations having pharmaceutical and veterinary purposes, and also for stock feed.

We have carefully studied the other cases cited in plaintiff's briefs, and find it unnecessary to review them in detail principally because all are distinguishable from the present case for the reasons applied in discussing the *Sheldon* case. Each related to merchandise that had been subjected to cleaning and drying processes, or cleaning, drying, and separation operations, but in every instance the only purpose was "to get the article by itself," which the appellate court in the *Sheldon* case very strongly announced did not advance the merchandise *per se*. As hereinabove outlined, that doctrine has no application here. When the crude commodity—in the instant case, the dogfish liver— has been manipulated making its valuable substance, the oil, available, a new product has come into being which, for the purposes of this case, is an advanced drug and as such properly classifiable under paragraph 34, as found by the collector.

The court so holds. This reasoning is in line with the decisions of this court in *Parke, Davis & Co.* v. *United States*, 66 Treas. Dec. 304, T. D. 47282, holding halibut-fish livers to be crude drugs, and the *Atlantic Coast Fisheries Corp.* case, *supra*, wherein fish-liver oils were held to be advanced drugs.

The Canadian Trade Agreement, published in T. D. 49752, in modifying paragraph 52 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 52), contains a provision for "Shark oil and shark-liver oil, including oil produced from sharks known as dogfish, not specially provided for," and at the trial of the present case counsel for defendant sought to invoke that classification to the oil in question. But in

view of the manner in which this case comes before the court the said trade agreement provision cannot be considered. It is a descriptive provision, whereas the ones for "drugs" in paragraphs 34 and 1669, *supra*, are controlled by use, and under well-settled tariff principles a provision based on use of merchandise prevails. In view of the collector's classification of the imported oil as a drug, and the consequent presumption of correctness attaching thereto, defendant is precluded from raising the issue suggested.

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.