(C. D. 1332)

GEO. S. BUSH & CO., INC., ET AL. *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 12, 1951)

*Lawrence, Tuttle & Harper* (*George R. Tuttle* of counsel) for the plaintiffs.
*David N. Edelstein*, Assistant Attorney General (*Daniel I. Auster, Joseph E. Weil*, and *Sybil Phillips*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Dogfish-liver oil, the merchandise in question, has been the subject of much previous litigation with respect to tariff classification. *Geo. S. Bush & Co., Inc.* v. *United States*, 10 Cust. Ct. 313, C. D. 773, affirmed in *Same* v. *Same*, 32 C. C. P. A. 56, C. A. D. 285, and *Geo. S. Bush & Co., Inc.*, and *Robert E. Landweer* v. *United States*, 15 Cust. Ct. 83, C. D. 949. In each instance, the collector classified the merchandise as an advanced drug under paragraph 34 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 34),[1] assessing duty at 10 per centum ad valorem, and the importer claimed free entry under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. § 1201, par.

---

[1] PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

1669)[2] as a crude drug. While the issue in both cases was the same, each was presented on a different theory, resulting in opposite conclusions.

In the first case, C. A. D. 285, *supra*, plaintiff's claim was based on the premise that the sole purpose of processing the dogfish livers was to get the oil by itself, and that the treatment did not advance the imported oil beyond a crude state. The appellate court, affirming our decision, C. D. 773, *supra*, held that "No evidence was offered by counsel for appellant [importer] to overcome the presumption of correctness attending the collector's classification," and accordingly sustained the action, classifying the oil as an advanced drug under paragraph 34, *supra*.

On retrial of the issue in the *Bush-Landweer* case, *supra*, this court upheld the importers' claim that the processing of the dogfish livers in Canada to acquire the imported oil was "essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture," as contemplated by paragraph 1669, *supra*, and therefore held the merchandise to be classifiable as a crude drug under said paragraph.

Although the present merchandise is the same as that passed upon in the two cited cases, and the collector's assessment as well as plaintiffs' claim are identical with those made in the two earlier cases, here, a new or different situation has developed through defendant's alternative claim, injected during the course of the trial, urging classification of the merchandise under the provision for "Shark oil and shark-liver oil, including oil produced from sharks known as dogfish, not specially provided for" in paragraph 52 of the Tariff Act of 1930, as amended by the trade agreement with Canada, 74 Treas. Dec. 235, T. D. 49752, carrying a rate of 10 per centum ad valorem, the same as that applied by the collector.

In presenting such claim, however, defendant has not abandoned the collector's classification as an advanced drug. Because the attitude puts defendant in a dual position—seeking a new classification and attempting to support the collector's action—disposition of alleged applicability of said amended paragraph 52 is made at this point in the interest of clarification and simplification of issues.

The Canadian Trade Agreement, T. D. 49752, *supra*, wherein the *eo nomine* provision for dogfish-liver oil, or shark-liver oil, appeared for the first time in any tariff legislation, became effective on January 1,

---

[2] PAR. 1669. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided,* That no article containing alcohol shall be admitted free of duty under this paragraph.

1939, approximately 5 years before the earliest of the 16 shipments involved in this case. The trade agreement was made pursuant to the provisions of section 350 (a) of the Tariff Act of 1930, as amended [3] (19 U. S. C. § 1351 (a)), authorizing the President to negotiate foreign trade agreements. The limited powers conferred under said section 350 (a) are comprehensively set forth in *Abercrombie & Fitch Co.* v. *United States*, 9 Cust. Ct. 336, C. D. 709, wherein the court held to the effect that the authority of the President to proclaim modifications of "existing duties" must necessarily have reference to existing rates of duty on existing classifications of imported merchandise under the respective paragraphs of the Tariff Act of 1930.

*United States* v. *Canadian National Railways*, 29 C. C. P. A. 272, C. A. D. 202, gives the same interpretation. In that case, lithographically printed tourist literature was claimed to be classifiable under an *eo nomine* provision for such merchandise in paragraph 1410 of the Tariff Act of 1930, as amended by the trade agreement with Canada, *supra*. The claim was denied after finding that the scope of paragraph 1410, as originally enacted in the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1410), did not include lithographically printed articles. Reaching its conclusion, the court, speaking through Jackson, J., said:

In the modification of said paragraph 1410, by the said trade agreement, "tourist literature" was first mentioned *eo nomine*. That fact, however, is of no importance here for the reason that that portion of the said agreement modifying paragraph 1410 was clearly intended to change the rate of duty only on articles already embraced within the scope of said paragraph.

Applying the same element of restriction to paragraph 52, as amended, *supra*, the provision therein for shark-liver oil or dogfish-

---

[3] Sec. 350 (a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency in restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public, and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

(1) To enter into foreign-trade agreements with foreign governments or instrumentalities thereof; and

(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign-trade agreements, as are required or appropriate to carry out any foreign-trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided*, That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part.

liver oil, can embrace only such oil as was covered by the provisions of paragraph 52 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 52).[4] Both parties recognize the soundness of such construction.

Defendant, contending that the present merchandise has always been included within the scope of paragraph 52 in its original form, points to the residuary provision therein for "all other animal and fish oils, fats, and greases, not specially provided for." It is argued, citing *United States* v. *Sears, Roebuck & Co.*, 20 C. C. P. A. 295, T. D. 46086, that the said provision includes the dogfish-liver oil in question under the recognized principle "that where a general class of articles is named in a tariff law without specifying each article coming within the class, each of said articles is regarded as enumerated as clearly as if the proper names of each and all of them had been given." Government counsel, in their brief, conclude this way: "* * * It therefore follows that the provision contained in the Trade Agreement for shark oil and shark liver-oil including oil produced from sharks known as dogfish, was always contained in paragraph 52 of the Tariff Act of 1930 as clearly as if these proper names had been given."

Plaintiffs, in contradiction, cite *Wilson & Son* v. *United States*, 6 Ct. Cust. Appls. 255, T. D. 35476. There, the merchandise consisted of jacquard-figured nettings, flouncings, and edgings. Sustaining a classification for lace articles, and excluding the merchandise from a provision for "all other Jacquard figured manufactures of cotton," the court said that the latter provision "may be regarded as a group enumeration in the sense that it is comprehensive enough to embrace all Jacquard figured manufactures not provided for in the paragraph, but to say that it is a group enumeration in the sense that it must be accepted as the equivalent of a provision designating *by name* every article, class, and kind of Jacquard figured manufactures of cotton not mentioned in paragraph 258 is an assumption which we think is entirely gratuitous. Certainly no such assumption is justified by the history of the legislation, the language of the act, or the relation one to the other of its several provisions." It follows therefrom that the principle set forth in the *Sears, Roebuck & Co.* case, *supra*, is not as all-embracive as defendant suggests in its reasoning. On the contrary, the scope of the rule is dependent upon considerations essential for proper effect to congressional intent, which all recognize to be the controlling influence in tariff construction.

Based on such premise, plaintiffs contend that the provision for "all other * * * fish oils" in paragraph 52 of the Tariff Act of

---

[4] PAR. 52. Oils, animal and fish: Sod, herring, and menhaden, 5 cents per gallon; whale and seal, 6 cents per gallon; sperm, crude, 10 cents per gallon; sperm, refined or otherwise processed, 14 cents per gallon; spermaceti wax, 6 cents per pound; wool grease containing more than 2 per centum of free fatty acids, 1 cent per pound; containing 2 per centum or less of free fatty acids and not suitable for medicinal use, 2 cents per pound; suitable for medicinal use, including adeps lanæ, hydrous or anhydrous, 3 cents per pound; all other animal and fish oils, fats, and greases, not specially provided for, 20 per centum ad valorem.

1930 is limited to industrial oils and does not extend to medicinal substances. The record supports that position. Testimony offered by plaintiffs shows that dogfish-liver oil, or shark-liver oil, as a medicinal substance, was not developed until long after the Tariff Act of 1930 went into effect, around 1938 or 1939. Three of plaintiffs' witnesses testified that dogfish-liver oil, like that in question, was not imported until 1940, approximately 2 years after the Canadian Trade Agreement became effective, and that during 1937 or 1938, prior to passage of the trade agreement, dogfish-liver oil was used for various purposes, in the same way as body oils of herring or sardines. Those uncontradicted facts are sufficient to say that dogfish-liver oil, the drug, did not become an article of commerce until after the Canadian Trade Agreement went into effect, and therefore the commodity is not within the class or the kind of oils considered by the trade agreement negotiators. Hence, paragraph 52, as amended, *supra*, cannot apply to the product under consideration.

The conclusion is consistent with data contained in Tariff Information Summaries for 1921 and 1929 which were available and known to Congress prior to enactment of tariff legislation pertinent to the present issue. The earlier publication was considered when the bill, ultimately enacted as the Tariff Act of 1922, was in process, and the later one was prepared for congressional use in its deliberations on legislation that became the Tariff Act of 1930. Each volume, referring to the general provision for fish oils (paragraph 53 of the Tariff Act of 1922 and paragraph 52 of the Tariff Act of 1930), stated that such products are used extensively in soap manufacturing, for adulterating linseed oil, in the leather industry, and in paints. Nothing appeared in either of the official documents, indicating any recognition of fish-liver oil as a substance chiefly used for medicinal purposes. Counsel for defendant, in their brief, quote from "Digests of Trade Data," a publication issued by the trade agreement negotiators, that discusses concessions made by the modifications to various paragraphs of the tariff act. Defendant's references to that document, as it discusses paragraph 52, are not herein applicable as they do not relate to imported dogfish-liver oil, but rather to the domestic production of that oil, and also to fish livers.

Elimination of amended paragraph 52, *supra*, reduces the issue to the single question concerning the condition of the dogfish-liver oil here involved. That the substance is a drug, within the meaning of the term as set forth in paragraph 34, is implied in the presumption of correctness attached to the collector's classification under said paragraph, which carries the findings that the merchandise is an inedible, natural, uncompounded substance, that it possesses therapeutic properties, and that it is chiefly used for medicinal purposes. We proceed, therefore, with the issue narrowed to the sole 'question

whether this dogfish-liver oil is in a crude state, as claimed, or advanced in value or condition, as assessed.

The case has been the subject of several hearings as enumerated in the writer's dissenting opinion in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175. Final submission was made at Seattle, Wash., before a single member of this court on circuit under statutory authorization issued by the chief judge to hear or to hear and determine the case (28 U. S. C., 1946 ed., Supp. III, § 254). After the case was submitted, plaintiffs moved for reopening to have certain rulings of the trial judge reviewed and also to have a commission issued to take additional testimony. Decision on the motion, C. D. 1175, *supra*, dealt largely with the right of the division to assume jurisdiction. The views of the writer of this opinion continue as the minority expression from the division on the subject. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering to my position in said C. D. 1175, but for the purpose of expediting the work of the court, I am preparing this opinion and participating in the judgment attached thereto.

The record consists of more than 2,500 pages of testimony and approximately 60 documentary exhibits. To outline the testimony of each of the several witnesses, as they appeared for the respective parties, would serve no useful purpose toward our disposition of the case. Pertinent parts of the proof will be referred to as the following discussion requires.

Dogfish livers are natural, uncompounded substances, containing no alcohol. Although they may be eaten without deleterious results, they are not taken as food and therefore are "not edible," within the meaning of those words as used in paragraphs 34 and 1669, *supra*. *United States* v. *Yick Shew Tong Co.*, 25 C. C. P. A. 255, T. D. 49392. The livers are desirable for their quantity of the therapeutically valuable vitamin A, which, in the natural state, exists in liver tissue as well as in solution. To obtain the maximum amount of vitamin-A content, the livers are destroyed and the therapeutic element is extracted in oil, which is the merchandise in question.

A representative of each of the exporters, whose shipments are included in the present case, described the processes followed by his company.

British Columbia Packers, Ltd., receives the livers in its plant through a gear pump that macerates the material for delivery to cooking tanks where it is steamed. After partial separation in a cooking tank, the material is passed through a centrifuge, a revolving apparatus or instrument, that separates the solids and water from the oil that is discharged into tanks. Purification is accomplished by passing the

oil through a high-speed centrifuge, thereby removing the moisture and solids to a very fine point.

Canadian Fishing Company, Ltd., and Washington Laboratories load the raw dogfish livers into large digesters where they are cooked by steam. They are then ground or macerated and the resultant product goes through a battery of centrifuges for mechanical separation of the foreign matter from the oil, containing vitamin A. To the residue is added (in quantity of one-half of 1 per centum to 3 per centum) a caustic that serves to "break down the liver tissue more readily." Gelatin Products Co. follows the same procedure, except to add a further mechanical operation, using a filter aid, to remove foreign matter not extracted by the centrifuges.

Western Chemical Industries, Ltd., grinds the livers and then applies heat treatment (about 140° Fahrenheit), through which the oil is separated out on top of the liver tissue, and then pumped off and drummed.

United Fishermen's Cooperative Association weighs the livers and then pumps them to digesters where they are ground or macerated, to be cooked with live steam. The oil is floated by gravity to a separate tank. The residue is further digested with addition of a small amount of caustic soda and then passed through a centrifuge, causing separation of the oil that is heated for removal of moisture and protein.

Processing of the livers is undertaken as soon as they are available and plant operations will permit, because deterioration begins immediately upon the death of the fish, resulting in the breakdown of amino acids and various protein derivatives and causing creation of free fatty acid, enzymic and bacterial action, with consequent loss of vitamin-A potency. Plaintiffs' witness, Elsey, a qualified biologist and biochemist, who had charge of the production of dogfish-liver oil by his company (British Columbia Packers, Ltd.), described the condition as follows:

> If you take the oil out of a liver when it is a minute dead, it is better oil; it has less free fatty acid; it is sweeter; it has various characteristics which are not identical with oil that was taken out even an hour later, and if you carry that to two, or three, or four weeks, the change is progressively greater.

Dogfish-liver oil has therapeutic value on the human and animal systems, in its use as a remedy for night blindness, skin diseases, faulty absorption of the gastrointestinal tract, and other physical difficulties, all of which are caused by deficiencies in vitamin A. The commodity is never used *per se* but is always further processed. When administered to cattle and poultry, it is usually blended with other oils, although occasionally, in "acute" cases, and especially to larger animals, it is given alone. As a remedy for humans, it is used in concentrated form, either as a capsule or in a liquid preparation.

The preponderance in weight of the evidence on the matter of use supports the collector's recognition and classification, as a drug, and establishes that the oil in question, having a therapeutic element, is chiefly used for medicinal purposes. On this phase of the case, the well-prepared briefs by counsel for both parties, as well as a considerable portion of the record, deal with the question whether vitamin A is a drug or a food. Careful consideration has been given to the positions taken by the respective parties on that interesting subject, but we do not consider this litigation as the proper vehicle for the issue to be raised and decided. Accordingly, the proof relating to vitamin A as an ingredient in food has not been regarded as having any important bearing on the disposition of this case.

Counsel for plaintiffs, in their brief, argue that "Although dogfish livers are a source of drug material, they are not drugs. Consequently the oil is the crude drug." *United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. 73, C. A. D. 318, is cited. In that case, the merchandise consisted of beef liver extract, prepared in Brazil, the country of exportation, by grinding frozen beef livers, adding water, and subjecting the mixture to heat treatment and other manipulations, that ultimately produced a concentrated extract of vitamins with therapeutic value in the treatment of anemia, malnutrition, and other conditions. The beef livers, from which the imported material was obtained, were of the kind which in Brazil and in this country are edible, and the insoluble portion remaining after the extraction is used for food purposes by humans and animals. Based upon such findings, the appellate court held "the classification of the collector that the instant merchandise is an advanced drug does not necessarily imply that the collector found that the livers were drugs. His classification might imply that he found that a drug, made from a material which was not a drug, had been advanced after it became a drug." The dogfish livers, as the source of the imported oil under consideration, are not comparable with the beef livers, from which the extract, involved in the cited case, was obtained. As we said in the *Geo. S. Bush & Co., Inc.*, and *Robert E. Landweer* case, *supra*;

Dogfish livers are natural, uncompounded drugs of animal origin. They are inedible and possess therapeutic properties in crudest form. They specifically meet all requirements for merchandise provided for in paragraph 1669, *supra*. This conclusion not only gives recognition to the provisions of said paragraph 1669, as modified by the Canadian Trade Agreement, T. D. 49752, *supra*, wherein fish livers are referred to as crude drugs of animal origin, but it also supports judicial interpretation to the same effect. *Parke, Davis & Co.* v. *United States*, 66 Treas. Dec. 304, T. D. 47282; *E. R. Squibb & Sons* v. *United States*, 69 Treas. Dec. 1333, Abstract 34350.

Testimony herein, of four pharmacists, called by plaintiffs, does not disturb the conclusion reached in the *Bush-Landweer* case, as just quoted and followed here. Their statements are cumulative to the

effect that dogfish livers are not listed in the United States Pharmacopoeia, the Homeopathic Pharmacopoeia, or similar publications, and that they are never dispensed *per se* or included in prescriptions. Such personal opinions, however, are not criteria for tariff classification of a drug, which is fixed by a congressional standard, appearing as a proviso in paragraph 34, *supra*, and reading "That the term 'drug' wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes." *Sherka Chemical Co., Inc. v. United States*, 33 C. C. P. A. 53, C. A. D. 316, characterized that language as "an excluding provision" and "not an all inclusive definition of the term 'drug'," and held that, for classification as a drug, it is not necessarily required that the substance be ready for use without further processing. It is not material in this case that dogfish livers are not used as such in pharmaceutical practice.

Equally insignificant to the present issue, is the fact that dogfish livers are not shown as drugs in the official compendiums, hereinabove mentioned. In the *Yick Shew Tong Co.* case, *supra*, the merchandise consisted of Chinese commodities, held to be classifiable as drugs, yet none of them appeared in the United States Pharmacopoeia, or any like volume. The controlling condition is that merchandise conform to the qualifications set forth in either paragraph 34 or 1669, *supra*. Dogfish livers, from which the oil under consideration was acquired, meet such requirements, and therefore are drugs in the tariff sense.

The conclusion leads to the question whether the processing in the country of exportation advanced the livers in value or condition, within the purview of paragraphs 34 and 1669, *supra*. In approaching this issue, it will be noted that each of the different processes followed by the several exporters of the present merchandise included maceration or grinding the livers, resulting in their destruction, to obtain the imported oil with its therapeutic element, vitamin A. Grinding, it will be observed, is one of the operations expressly mentioned in the statute as being an advance in value or condition, unless it does not constitute any "process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture," paragraphs 34 and 1669, *supra*.

Thus the issue is narrowed to the proposition whether the manipulation of the livers in the country of exportation was essential to prevent decay or deterioration of the drug. If so, the imported merchandise has not been advanced beyond a crude state; otherwise, the oil in question is an advanced drug. This record leaves little doubt in supplying the answer.

Deterioration of dogfish livers begins immediately upon death of the fish. Liver cells begin to degenerate. Destructive enzymes continue to act, causing a hydrolytic effect bringing in oxidation, and

the breakdown of various protein derivatives, resulting in the development of free fatty acid with attendant discoloration and disagreeable odor and consequent loss of vitamin A.

The longer that the oil, with its vitamin content, remains in contact with the liver tissue, the less stable it becomes. Stability refers to the so-called induction period, during which dogfish-liver oil holds its vitamin content without deterioration under conditions of environment. At the end of the induction period, which is variable in all vitamin-containing substances, oxidation sets in, splitting the molecule into fragments, and decomposition of the vitamin increases.

Refrigeration, salting, and the use of chemical substances are recognized commercial methods for preserving dogfish livers. Each varies in degree of effectiveness, but none stops deterioration. Salting was characterized as a very inferior method of preservation. Freezing does not arrest deterioration but slows it down. The effective way of preserving the medicinal value of the drug is in the form of free oil, removed from liver tissue, because the oil contains chemical compounds, called antioxidants, with properties that protect vitamin A against destruction by exposure to air.

While the record is sufficient to say that there is deterioration in some degree with loss in potency of vitamin A, as long as the livers are in transportation and without converting the drug to the form of oil, the proof is equally clear that dogfish livers, the crudest form in which the therapeutic or medicinal properties first appear, are articles of commerce, and shipped as such from different parts of the world into the United States, and in this country they are dealt in and processed, just like the livers from which the oil under consideration was obtained, for their medicinal value, and to extract the oil with its therapeutic element, vitamin A. In this connection, brief reference is made to testimony of witnesses for both sides.

Plaintiffs' witness Erling Week, executive of a company engaged in the manufacture of vitamin-bearing oils, vitamin concentrates, and poultry-feeding oils, testified that he had processed in his plant at San Francisco shark livers that had been shipped into the United States from Australia, the Philippines, Argentina, Mexico, the Central American countries of El Salvador, Honduras, Costa Rica, Nicaragua, and from Columbia, Peru, Ecuador, Cuba, and Brazil.

Another witness appearing on behalf of plaintiffs, Dr. Horace N. Brocklesby, coordinator of research for the Special Products Division of the Borden Co., whose duties include development of processes relating to the production of dry concentrates, containing vitamins, minerals, and proteins, used in pharmaceuticals, testified that since 1937 shark livers and dogfish livers have been exported from Canada to the United States in very large and substantial quantities, that such livers are received in this country in very substantial quantities

from South America, Mexico, Peru, and South Africa, and that all of those livers received from the different parts of the world were commercially usable and processed into oil for the same purpose, as Canadian oil, like that in question. Shark livers, taken from dogfish sharks caught in Alaskan waters, have been iced or frozen and transported in American vessels to Seattle, Wash., where they have been processed into the form of oil. Dr. Brocklesby testified further that his employer, the Borden Co., processed shark livers at its plants in Florida, Oakland, Calif., and Elgin, Ill., all for the purpose of obtaining vitamin-A bearing oil. The livers so processed had been brought in either from Cuba or Mexico.

, Charles Roy Elsey, also plaintiffs' witness, knew that dogfish livers, taken by American fishermen in Alaskan waters, were frozen in Alaska and later transported to Seattle, Wash., for processing. Dr. Oser, also testifying for plaintiffs, stated that shark livers are exported from Canada, Mexico, and Argentina to the United States.

Defendant's witness, Roger Harrison, engaged in the manufacture of vitamin oils from fish livers and fish viscera, testified that shark livers, shipped to his processing plant in Seattle, Wash., from Los Angeles, 1,500 miles to the south, were received iced or frozen and in good condition, and this plant processed several million pounds of shark livers a year.

Fishermen, Nels Stenvaag and Nick Mathison also testifying on behalf of defendant, stated that shark livers which they caught in Alaskan waters, were iced and delivered in good condition to Seattle, Wash., a distance ranging between 1,400 to 1,600 miles. Their testimony is corroborated by Olaf Eriksen, dock manager for Halibut Producers Cooperative, who stated that he had seen shark livers delivered from boats upon which the witnesses, Stenvaag and Mathison, had worked. Eriksen further testified that at Seattle he supervised the unloading and storing of shark and dogfish livers, that such livers remained in cold storage from 2 weeks to 6 months, and that at the expiration of their period of storage, the livers were in good condition.

Elbridge Whitmarsh, receiving clerk for Halibut Liver Oil Producers, worked at both of his company's plants, located at Ketchikan, Alaska, and Eureka, Calif. At Ketchikan, shark livers are received in cans of 40-pound capacity. Livers received in such containers are in good condition. They are placed in cold storage until it is possible to ship them, the time of storing ranging from 2 to 4 months. Shipment to Eureka, Calif., takes 3 weeks, and upon receipt there, the livers have been found to be in fine condition.

Counsel for plaintiffs, recognizing the effectiveness of the testimony just reviewed, make the following statement in their brief:

As appears throughout the record, shark livers are shipped long distances to the United States, from the Philippines, Japan, Argentina, Mexico, Peru, etc. (R. 646), and from Alaska (R. 126) and Los Angeles (R. 1545) to Seattle.

That concession—an entirely logical one under the circumstances—admitting as it does the existence commercially of shark livers, the crude drugs, is a controlling factor in our disposition of the issue under consideration. The approach is a departure from reasoning followed in the *Bush & Co., Inc.-Landweer* case, *supra*, but in doing so, we recognize that the record here is materially different from that presented therein.

The importance of the crude drug, as an article of commerce, in an issue like that before us, was emphasized in *United States* v. *Magnus, Mabee & Reynard, Inc.* (decided as recently as May 8, 1951), 39 C. C. P. A. 1, C. A. D. 455. In that case, the imported commodity was chaulmoogra oil obtained from seeds, which, after being dried for several days, were cracked to get the kernel inside. The kernel was macerated by means of a press, thereby extracting heavy oil, the imported substance, used for the treatment of leprosy. Holding the chaulmoogra oil to be a crude drug, within the provisions of paragraph 1669, *supra*, the appellate court, speaking through Garrett, C. J., quoted with approval from the opinion of this court, *Magnus, Mabee & Reynard, Inc.* v. *United States*, 25 Cust. Ct. 37, C. D. 1260, stating that "the chaulmoogra oil as imported is the crudest form of the drug known to commerce, and that in such form it has not been advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the oil and the prevention of decay or deterioration pending manufacture."

Recognition of the chaulmoogra oil as the "crudest form of the drug known to commerce" follows reasoning employed in *Vandegrift & Co.* v. *United States*, 13 Ct. Cust. Appls. 30, T. D. 40865, which held dried and ground inedible cattle glands to be crude drugs. The court said in that case:

The proof shows that if the gland was dried, before the manufacturer could extract the principles, it must be ground. If the whole dried gland could be satisfactorily preserved without grinding it would seem that the grinding process would be an advancement bringing the commodity within paragraph 34, but as this record appears before us the proof shows that the gland is not imported in its dried condition except ground, and that *attempts to import the dried unground gland were unsuccessful*. It is clear that the drying is not an advancement, and in the record before us we think it appears that the grinding is a part of the process of preparation essential to the prevention of decay or deterioration pending manufacture. It may be a fact that the gland as a whole can be dried and satisfactorily transported to this country in its whole dried condition. If the record so showed we would be inclined to hold that the grinding would be an advancement taking it out of paragraph 1567, but in this record the contrary appears. [Italics ours.]

*United States* v. *R. Hillier's Son Co., Inc.*, 16 Ct. Cust. Appls. 103, T. D. 42762, is also in point. There, the merchandise consisted of soapbark siftings, in the form of a very fine powder, produced from processing the bark of a Chilean tree known as quillai or quillajo. The imported substance was held to be an advanced drug, rather than in a crude state, and in reaching its conclusion the court said:

The record now before us, as has been stated, discloses that the material in question here can be, and is, imported as bark, and that the form in which we now find it is not necessary for the prevention of decay or deterioration pending manufacture. This being the test imposed by the statute, it can not be held to be crude. The bark itself is shipped from Chile to Germany, there processed, and then brought back, which, in itself, demonstrates the feasibility and practicability of the importation of the crude bark.

We have little doubt that if the record in the *Magnus, Mabee & Reynard, Inc.* case, *supra*, contained anything like the convincing testimony, not to mention the admission by plaintiffs' counsel, in this case, that the seed from which the chaulmoogra oil had been obtained, like the livers from which the oil in question has been extracted, was an article of commerce, then, within the line of thought expressed in the *Vandegrift* and the *Hillier's Son Co., Inc.* cases, *supra*, classification as an advanced drug would have prevailed.

We proceed now with a discussion of the cause and effect of the processing in Canada of the shark livers from which the oil in question was obtained, and determination whether such treatment was essential to proper packing of the drugs and prevention of decay or deterioration, as contemplated by the statute, paragraphs 34 and. 1669, *supra*.

"Essential" is defined in Webster's New International Dictionary, 1933, as follows:

3. Important in the highest degree; indispensable to the attainment of an object; indispensably necessary.

"Essential" means "indispensably necessary; important in the highest degree; requisite." *Pittsburgh Iron & Steel Foundries Co.* v. *Seaman-Sleeth Co.* (D. C. Pa.), 236 Fed. 756, 757. The words "essential" and "necessary" have been defined as synonymous and frequently used interchangeably. *City of Kalamazoo* v. *Balkema et ux.*, 233 N. W. 325, 326; 252 Mich. 308. "Essential" connotes something indispensable and not merely convenient. *City of St. Louis* v. *Dreisoerner*, 147 S. W. 998; 243 Mo. 217; 41 L. R. A. (N. S.) 177.

Applying the cited definitions in association with the statutory language under discussion, processing of a crude drug to prevent "decay or deterioration pending manufacture" contemplates only such treatment or manipulation indispensably necessary for commercially satisfactory preservation of the drugs during transportation . and pending manufacture, and which would prevent decay or de-

terioration that would result in substantial loss of the therapeutic or medicinal properties, rendering transportation and importation of the drugs into the United States commercially impracticable or infeasible. Applied to dogfish livers, the decay or deterioration would have to be so substantial in amount of loss of vitamin A that the livers, during the period of transportation, would become commercially unfit and unusable for the commercial extraction of vitamin-A bearing oil. The statute, permitting a process or treatment not beyond that essential to proper packing of the drugs and prevention of decay or deterioration, does not embrace or extend to *all* decay or deterioration or even ideal methods assuring maximum effectiveness, but rather is limited to reasonable commercial means to prevent decay or deterioration.

With such a statutory construction in view, we turn to plaintiffs' testimony on this phase of the case. Witness Elsey, asked if he knew how much vitamin-A deterioration occurs when well-iced dogfish livers are frozen and held in cold storage at temperatures used for the holding of frozen fish, answered, "No, I don't know how much." John N. Valianos, president of Broval, Inc., processors of fish livers into vitamin A, made the general statement that "in our experience there has always been some loss in the form of deterioration of vitamin A, the loss of a quantity of vitamin A." Dr. Brocklesby could not say how much deterioration of vitamin A occurs while dogfish livers are stored in ice over any given period of time. Of like tenor is the testimony of Dr. Oser, who made the general statement that "the lower the temperature of storage, the less the deterioration. Under a given set of storage conditions, the longer the oil has been in contact with the liver prior to refrigeration, the greater will be the deterioration."

The weakness in plaintiffs' proof on this point is that none of the witnesses stated that when shark livers are preserved by any of the recognized commercial preservatives the loss of vitamin A from shark livers during transportation is so substantial that the preserved livers would be commercially unusable and the extraction of vitamin-A oil rendered commercially not feasible. The gist of plaintiffs' testimony is that none of the commercially accepted and recognized methods of preserving shark livers will completely halt deterioration and loss of vitamin A, and that none of such methods are completely effective. But this is not what the statute requires for concluding that processing is "essential" to prevent decay or deterioration pending manufacture.

Plaintiffs' evidence is not sufficient to say that processing shark livers into the form of oil was not an advancement in "value or condition" from a crude state. The record is conclusive that the shark livers, the crudest form in which the therapeutic or medicinal proper-

ties exist, are articles of commerce in both domestic and international trade and commerce of the United States, and that shark livers are satisfactorily preserved during long periods of time, and transported over distances extending from 1,500 to 5,000 miles without such substantial loss of vitamin A as would render the extraction of vitamin-A oil from the livers commercially impracticable or infeasible. In other words, the crude drugs—shark livers—could readily have been transported instead of the oil from the livers. It may have been convenient or desirable for the exporters or shippers, from their viewpoint, to process the shark livers and export the extracted oil rather than the livers, but such considerations, whether economic, business, or for some other personal motive, of the exporters or shippers, are wholly immaterial toward determination whether a drug is in a crude state or an advanced condition.

Processing the shark livers into the form of oil advanced the crude drug along the line of its ultimate manufacture. Treatment in Canada of the shark livers was not essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture. On the contrary, the manipulation in the foreign country advanced the crude drugs "in value or condition," bringing the imported oil within the purview of paragraph 34, *supra*, and classifiable thereunder as an advanced drug, subject to duty at the rate of 10 per centum ad valorem, as assessed by the collector.

Plaintiffs' claim, alleging that an embargo existed on exportation from Canada of dogfish livers, and therefore the imported oil was the crudest form in which the drug could be obtained, is unsupported. The record shows that at the time in question exportation of dogfish livers was conditional, being allowed only upon issuance of a permit by the Canadian Government. Such circumstances offer no reason for determining the tariff status of this imported merchandise, even though only one permit might have been issued over a period of 5 years. To uphold plaintiffs' contention and allow a regulation or an order of a foreign government to fix tariff classification in this country, is so far removed from an interpretation consistent with intent of Congress, that the matter needs no discussion.

Cases cited on this point in the brief of counsel for plaintiffs have no application. *Perry, Ryer & Co.* v. *United States*, 2 Ct. Cust. Appls. 374, T. D. 32096; *Judson-Sheldon Corp.* v. *United States*, 13 Cust. Ct. 65, C. D. 871, affirmed in *United States* v. *Judson-Sheldon Corp.*, 33 C. C. P. A. 73, C. A. D. 318; *Vandegrift & Co.* v. *United States, supra*; *G. D. Searle & Co.* v. *United States*, 21 Cust. Ct. 112, C. D. 1138; *United States* v. *Judson-Sheldon Corp.*, 37 C. C. P. A. 89, C. A. D. 424. There is no reason to review any of those cases because none of them involved, even remotely, any question about an embargo, such as plaintiffs have injected here.

The writer of this opinion wishes to acknowledge, following numerous conferences with his colleagues of the division, contributions each has made to the research reflected in this opinion and the conclusions reached.

The litigation has been long and tedious, well tried, and ably briefed, and is another step in the chain of thought associated with the proper construction to be placed upon the paragraphs of the tariff act involved, leading to a conclusion which seems to us is clearly established by the record.

The protests are overruled and judgment will be rendered accordingly.