(C.D. 3925)

Los Angeles Tile Jobbers, Inc. v. United States

United States Customs Court, First Division

(Decided November 17, 1969)

*Glad & Tuttle* (*Robert Glenn White* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Owen J. Rader* and *John A. Winters*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

RE, Judge: The merchandise involved in this protest consists of six separate sheets of paper, imported in bulk and invoiced as printed brochures, each of which contains one or more illustrations of floor or wall tiles. Next to each illustration of the tile is a description printed in Italian, English, French and German.

The sheets were classified as other printed matter not specially provided for, under item 274.90 of the Tariff Schedules of the United States and assessed with duty at the rate of 15 per centum ad valorem. Plaintiff claims that they should have been classified under item 270.45 as books, not specially provided for, consisting essentially of textual matter wholly or almost wholly of foreign authorship, and assessed with duty at the rate of 3 per centum ad valorem. Alternatively, plaintiff also claims that they are classifiable under item 270.50 as books not specially provided for, consisting essentially of textual matter, other, and dutiable at the rate of 7 per centum ad valorem. The pertinent statutory provisions provide as follows:

Schedule 2, Part 5 of the Tariff Schedules of the United States:

"Part 5.—Books, Pamphlets, and Other Printed Matter

Part 5 headnotes:

\*　　\*　　\*　　\*　　\*　　\*　　\*

2. For the purposes of this part—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(b) the term "books" includes books, bound and not bound, and pamphlets;

\*　　\*　　\*　　\*　　\*　　\*　　\*

Books not specially provided for, consisting essentially of textual matter:

| | | | |
|---|---|---|---|
| 270.45 | Wholly or almost wholly of foreign authorship | 3% | ad val. |
| 270.50 | Other | 7% | ad val. |

\*　　\*　　\*　　\*　　\*　　\*　　\*

Printed matter not specially provided for:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Other:
274.85       Susceptible of authorship_____   4%   ad   val.
274.90       Other _____   15%   ad   val."

Plaintiff's collective exhibit 1, the sole exhibit received in evidence, consists of six sheets of paper representative of the controverted merchandise.

The sole witness who testified at the trial was Mr. Andrew Campbell, president of the plaintiff corporation, which imports ceramic tiles and marble products. Mr. Campbell's duties range from the placing of orders to the management of the general business of the corporation. He testified that the six sheets are advertising matter and information printed for architects to help promote plaintiff's products in the United States. He stated that the sheets are sent to plaintiff from the Fulget factory in Bergamo, Italy, that they are printed in English, German, Italian and French and that after plaintiff receives the sheets it types its name and address on them and affixes a label to them. The sheets illustrate various types of colored marble present in cement produced by the Fulget factory. Mr. Campbell further stated that these sheets are standard sheets which are sent to the Italian firm's distributors all over the world.

On cross-examination Mr. Campbell testified that he does not know who is the author of the six sheets. Plaintiff distributes them to architects and decorators by inserting the entire group into a folder marked with plaintiff's name, address, telephone number and the American Institute of Architects' code number for marble. The six sheets are not attached but are inserted randomly.

Plaintiff claims that the six sheets constitute "pamphlets or books, unfinished", and contends that the tariff schedules' provisions dealing with "Books, not specially provided for, consisting essentially of textual matter" is derived from Heading 49.01 of Chapter 49 of the Brussels Nomenclature which embraces "Printed books, booklets, brochures, pamphlets and leaflets". Plaintiff argues that:

> "While the superior heading to Items 270.45 and 270.50 does not refer to booklets, brochures, pamphlets, or leaflets, it is clear that the concept of the broad ambit of Heading 49.01 was being followed. This is made especially obvious when it is noted that Headnote 2(b) of Part 5, Schedule 2, TSUS, defines the term book as including pamphlets and unbound 'books.' The evidence herein establishes that the six sheets in issue are, after importation, marked with the United States' dealer's name and address and then put in a specially marked folder for supply to and reference by architects (R.10–11, 12–13). *As such the articles at bar are pamphlets or books, unfinished,* within the ambit of 'books' as

used in Part 5, Schedule 2, TSUS. There is no context contradictory to the statement in General Headnote 10(h), TSUS, that a tariff description of an article covers such articles in both an un-assembled and an unfinished state, and that provision consequently controls." (Plaintiff's brief, p. 5) [Emphasis added.]

Since headnote 2(b) states that the term "books" includes "books, bound and not bound, and pamphlets", the court must first determine whether the sheets in question are within the purview of books or pamphlets. Since the court has found no cases in point under the tariff schedules, it has examined the cases under prior tariff acts.

Plaintiff suggests that the legislative history of part 5, schedule 2, demonstrates a marked departure from prior practice. The court has examined the *Tariff Classification Study, Explanatory and Background Materials* (November 15, 1960), relevant to part 5, schedule 2, and notes that the tariff schedules have made certain changes. However, regarding items 270.45 and 270.50 there does not appear to be any significant change in criteria from that used in the Tariff Act of 1930. Specifically, the *Study* points out:

> "Items 270.45 and 270.50 would cover, without rate change (except as to leather bindings), books not specially provided for which are presently dutiable under paragraph 1410 at 5 per cent ad valorem, if of bona fide foreign authorship, and at 9 per cent ad valorem, if of other than bona fide foreign authorship.* * *"
> *Id.* at 137.

Thus it appears that plaintiff must show either that the sheets would have come within the scope of paragraph 1410 of the Tariff Act of 1930 or that the legislature intended to expand the analogue of paragraph 1410 in the tariff schedules (items 270.45 and 270.50) to embrace such sheets even though they would not have come within the scope of that paragraph under the Tariff Act of 1930.

A discussion of the applicable legal principles may commence with the case of *United States* v. *Field & Co.*, 14 Ct. Cust. Appls. 376, T.D. 42031 (1927). The merchandise in the *Field & Co.* case consisted of a portfolio of a front and back cover between which were inserted and bound together samples of 12 linen handkerchiefs cut in half. The following was printed on the front cover:

> "Dept. 71. Women's De Luxe H.S. Linen Handkerchiefs Hand Thread Drawn. M.F. & Co., Chicago."

Printed labels were pasted on the sample pieces of handkerchiefs. A representative sample read as follows:

> "Hand Thread Drawn
> All Linen
> No. 1111/1
> M.F. & Co. Dept. 71
> Made in Ireland"

Plaintiff claimed that the entire portfolio should have been classified under paragraph 1310 of the Tariff Act of 1922 (which, as far as relevant here was identical to paragraph 1410 of the Tariff Act of 1930), as "books," "[a]ll other, not specially provided for". The court indicated that in order to qualify as a book under that part of paragraph 1310 claimed by plaintiff, the article had to be susceptible of authorship. The court also quoted Webster's dictionary definition of "author" as "one who composes or writes a book, as composer as distinguished from an editor, translator, or compiler." Significantly, it noted that "[a] mere mechanical production, such as the importations here, is not, we think, susceptible of authorship as that word is used in the paragraph." *Id.* at 378. The court offered the following explanation:

> "* * * For the *purpose* for which it is used it is no more a book than a box containing the same samples, or a stiff cardboard with the samples attached, would be. The binding may make the handling thereof more convenient and may preserve the samples, but the entirety contains no printed matter that entitles it to be designated as a book." *Id.* at 379. [Emphasis in original.]

Hence, in the *Field & Co.* case the court held that the sample linen handkerchiefs, cut in half and bound in book fashion were not "books" under the pertinent paragraph of the Tariff Act of 1922.

Merchandise more similar to that in the instant case was the subject of controversy in *Barry & Staines Linoleum, Inc.* v. *United States*, 24 CCPA 383, T.D. 48831 (1937). That case involved a series of lithographically printed designs of linoleum, bound together in the form of a book. Preceding the designs was a single page giving on one side the various offices, factories, and warehouses of the company and a list of its board of directors. The other side contained a code to help prospective purchasers in ordering. On the back was printed in duplicate a representation of the trademark, the number, name, and width of the linoleum, and the name, code, and address of the manufacturer. In denying the merchandise the classification of a book under paragraph 1410 of the Tariff Act of 1930 the court said:

> "It seems obvious that if sheets or samples of actual linoleum had been used here instead of the paper sheets on which the linoleum designs were reproduced, the case would fall squarely within the doctrine of the *Field & Co.* case, *supra*, to the extent that the merchandise would not be classifiable under paragraph 1410, *supra*. While there is more printed matter in connection with the articles here involved than was present in connection with the portfolios of half handkerchiefs there involved, the inherent nature of such printed matter is practically the same in both instances, and 'authorship', as there defined and applied, is no more present here than it was there. Disregarding the printed language, can it be said then that using paper sheets upon which there are

403

reproductions of linoleum designs serves to render the articles books within the meaning of that term as there construed? We are unable so to conclude." *Id.* at 387–88.

In *United States* v. *American Railway Express Co. et al.*, 17 CCPA 10, T.D. 43317 (1929), the court distinguished between the merchandise in the *Field & Co.* case from that requiring "mental effort and ability to prepare." That protest involved publications issued by the Canadian National Railways describing localities accessible through the use of the railway and giving details concerning such subjects as fishing, hunting, camping, hotels and resorts. Some had many illustrations and contained several hundred pages of reading matter while others were smaller and contained only lists of resorts, time tables and similar information. Plaintiff claimed that the articles should have been classified under paragraph 1310 of the Tariff Act of 1922 as printed matter of bona fide foreign authorship. The court agreed and in sustaining plaintiff's protest stated:

> "Accepting the definition as thus given of an author, as 'one who composes or writes a book, a composer as distinguished from an editor, translator, or compiler,' it is evident to the court that the exhibits before us are susceptible of authorship. It would be a work of supererogation for us now to attempt to describe each exhibit individually, and to point out wherein authorship is manifest. It is sufficient to say that the exhibits are full of descriptive historical and geographical matter, and such matter as required mental effort and ability to prepare. * * *" *Id.* at 14.

The *American Railway Express Co.* case was distinguished in the case of *Nippon Yusen Kaisha* v. *United States*, 4 Cust. Ct. 218, C.D. 325 (1940), which involved certain "freight lists" consisting of a single sheet of paper ruled vertically into columns with printed headings of the information required to be filled in thereon such as the name of the shipper, the weight, rate, etc. Above the columns at the left appeared the importer's name and address, and to the right were printed headings for the name of the steamer, destination, date of sailing, etc. At the left thereof were eight clauses or conditions under which the merchandise was accepted for shipment. After noting that the mental effort test still posed some difficulties in determining whether a certain writing possessed authorship, the court pointed out that the only parts of the printed matter on the freight lists which had to be considered regarding the question of authorship were the eight clauses stating the conditions for shipment. The court then said:

> "* * * While these clauses may have required some mental effort and ability to arrange, they in themselves hardly, we think, can be said to be the result or the exercise of any original thought or expression. In our opinion, they are more in the nature of

403

general or set forms of conditions used in the shipment or transportation of merchandise in commerce." *Id.* at 220.

Consequently, in the *Nippon Yusen Kaisha* case, the court held that the "freight lists" did not rise to the dignity of authorship, and the claim of the plaintiff was therefore overruled. See also *Baker, Irons & Dockstader and General Motors Overseas Operations* v. *United States*, 38 Cust. Ct. 435, Abstract 60571 (1957), which was decided under the Tariff Act of 1930.

Since headnote 2(b) includes pamphlets within the term books, the court has examined definitions of "pamphlet" to determine whether the sheets in question fit within the scope of that term. Several definitions are listed below.

*Webster's Third New International Dictionary of the English Language Unabridged* (1968):

"pamphlet—n. 1 a: a brief treatment of a subject issued as a separate unbound publication * * * b: a controversial tract dealing with a religious or political question * * * 2 a: a printed publication having a format with no binding and with no cover * * * and often fastened with side or saddle stitches * * * b: an unbound publication other than a periodical having fewer than a fixed number (as 50, 80, 100) of pages—used esp. in library science."

*Funk and Wagnalls New Standard Dictionary of the English Language* (1956):

"pamphlet n. 1. A printed work consisting of sheets, generally few, stitched but not permanently bound. 2. A brief treatise or essay, usually forensic and on a subject of current interest: greatly in vogue in England during the 16th, 17th, and 18th centuries, and often bitter in tone."

*The Century Dictionary*, Volume 4 (1890):

"pamphlet, n. * * * 2. A printed work consisting of a few sheets of paper stitched together, but not bound; now, in a restricted technical sense, eight or more pages of printed matter (not exceeding five sheets) stitched or sewed, with or without a thin paper wrapper or cover. * * * 4. A short treatise or essay, generally controversial, especially one on some subject of temporary interest which excites public attention at the time of its appearance; a writing intended to publish one's views on a particular question, or to attack the views of another."

*Bouvier's Law Dictionary* (1914):

"pamphlet. A small book usually printed in octavo form and stitched."

*The New Century Dictionary*, Volume 1 (1946):

"pamphlet, n. A book of relatively few sheets, fastened together but not bound, and with or without a paper cover: usually dealing

with some one subject, as of temporary interest, and often controversial in character * * *."

The definitions demonstrate that a pamphlet may be briefly described as a printed publication consisting of a few sheets which are not bound but are generally stitched together, often treating a controversial subject of current interest. In no way do these definitions indicate that a pamphlet would include six single and unattached sheets containing pictures and descriptions of sample merchandise which, after importation, are randomly inserted into a folder and dedicated to promoting a product.

No case has been cited and none has been found which would justify classifying the sheets in the case at bar as pamphlets. In *General Foods Corp.* v. *United States*, 68 Treas. Dec. 472, T.D. 47952 (1935), the court examined several definitions of "pamphlet" and concluded:

> "Obviously, the above definitions contemplate more than a single sheet of paper, even though it be printed on both sides and folded into three separate folds so as to give the printed matter the form and appearance of pages, like the sample in evidence herein. Surely the folding and the arrangement of the printed matter in no sense alters the fact that the article was primarily a single sheet of paper and remains such, minus the printing.* * *" *Id.* at 474.

The court has examined the controverted merchandise and has concluded that at the time of importation and thereafter the sheets in question were not books or pamphlets within the pertinent provisions of the Tariff Schedules of the United States. Plaintiff's contention that General Headnote 10(h) is controlling does not alter this decision. That headnote provides that, "unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished". Plaintiff's contention would merit serious consideration if the sheets were eventually to become books or pamphlets, even though they were not such at the time of importation. The record clearly reveals that no processing or assembling is done to these sheets subsequent to importation other than typing plaintiff's name and address, affixing plaintiff's label on them, and inserting them randomly into a folder. At no time are they stitched or fastened together as are pamphlets. Surely, they are not bound or otherwise processed so as to become books either within the trade understanding or the common meaning of that term. See *Overton & Co.* v. *United States*, 22 Treas. Dec. 437, 438, T.D. 32327 (1912), wherein a book is defined in the trade sense as "a collection of leaves of any size permanently stitched or bound together in a cover, the binding being of the kind of work performed by the bookbinder."

It is also important to note that the pertinent statutory provision specifically requires that the "books" consist "essentially of textual matter". In the case at bar the text of each sheet consists on an average of approximately 30 to 35 words (and numbers), printed in four languages. The illustrations, however, cover approximately three to four times as much area as the printed matter. Plaintiff contends that "[t]he textual material that is in the articles at bar is essential to the articles, and consequently they are 'essentially' of textual matter, the illustration notwithstanding." (Plaintiff's brief, p. 6) The cases cited by plaintiff point out that the term "essential" means "necessary" or "indispensable". *U.S. Vitamin Corp.* v. *United States*, 43 CCPA 44, C.A.D. 607 (1956), *Geo. S Bush & Co, Inc., et al.* v. *United States*, 26 Cust. Ct. 251, CD 1332 (1951), affirmed 42 CCPA 190, CA.D. 592 (1955). Plaintiff argues that the text on the sheets in question is "necessary" to an understanding of the illustrations. While the court may agree that the text may be helpful or necessary for a prospective customer to appreciate fully the accompanying sample, it is nevertheless of the opinion that plaintiff has not proven that the sheets consist "essentially of textual matter".

Furthermore, in order for plaintiff's merchandise to come within the scope of item 270.45 plaintiff must prove that the sheets are "Wholly or almost wholly of foreign authorship". Although the sheets are printed in four languages, the only evidence of foreign authorship is the testimony by plaintiff's witness that he does not know who is the author of the material, but that he thinks that it is one of the brothers who own and operate the Fulget factory in Bergamo, Italy. Such testimony is inadequate to prove the fact of foreign authorship. *Kelly Publishing Co.* v. *United States*, 56 Treas. Dec. 108, T.D. 43493 (1929).

In view of the foregoing the court holds that the presumption of correctness attaching to the collector's classification has not been overcome, and that the protest is therefore overruled. Judgment will issue accordingly.